**Ronnie Lee BOWLING, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 1998–SC–0759–MR.**

Supreme Court of Kentucky.

March 21, 2002.

Rehearing Denied Aug. 22, 2002.

Susan M.J. Martin, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Teresa D. Harper, Bloomington, IN, Counsel for Appellant.

A.B. Chandler, III, Attorney General of Kentucky, Connie Vance Malone, Susan Roncarti, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, Thomas V. Handy, London, Counsel for Appellee.

JOHNSTONE, Justice.

Appellant, Ronnie Lee Bowling, was convicted of two counts of murder, two counts of first-degree robbery, and two counts of first-degree burglary. He was sentenced to death on each of the murder counts and twenty years' imprisonment on each of the other counts, which sentences were ordered to be run consecutively for a total of eighty years. His conviction and sentence were affirmed by this Court on direct appeal. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293 (1997), *cert. denied,* 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997). Subsequently, he filed an RCr 11.42 motion with the trial court to set aside the judgment against him. After an evidentiary hearing on the motion, the trial court denied the motion. This appeal followed. For the reasons set forth below, we affirm.

## I. *ALLEGED BRADY VIOLATION*

Bowling first alleges that the prosecution failed to disclose exculpatory information to the defense in violation of its duty to do so under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This allegation centers on the testimony of Tim Chappell.

Chappell and Bowling were incarcerated in the Laurel County Jail at the same time. Chappell was being held on federal charges that were completely unrelated to the state charges pending against Bowling. According to Chappell's testimony at trial, he and Bowling were friends at the jail, and, in the course of that friendship, Bowling confessed to committing the crimes with which he was charged.

### A. *Federal Charges*

■ Chappell was charged with four counts of mail fraud and faced a possible sentence of twenty years in prison in addition to a substantial fine. Three of the four federal charges against Chappell were ultimately dismissed. Chappell pled guilty to the remaining charge and was sentenced to two years in prison. Bowling argues that Chappell struck a deal to trade testimony in Bowling's state trial in exchange for a favorable disposition of Chappell's federal charges. In ruling on Bowling's RCr 11.42 motion on this issue, the trial court concluded that the evidence did not support finding that Chappell in fact had received a benefit for his testimony:

> Nothing in the record herein or testimony introduced at this hearing establishes that a benefit in fact was bestowed upon Mr. Chappell in his Federal case. Mr. Chappell's cooperation was brought to the attention of the Federal Trial Judge, but as to what effect it may have had, if any, upon his sentence, is not established.

In support of his argument that the federal court did take Chappell's cooperation into consideration, Bowling points to these comments made by the federal judge in pronouncing Chappell's sentence: "Now, the Court feels that probation is not quite in order, but the Court will give you what I feel is the minimum sentence under

this—under the situation we have here." This statement is hardly conclusive. Moreover, even if the federal sentencing hearing did definitively establish that a deal was struck, there could have been no *Brady* violation for failing to disclose either the disposition of the federal charges against Chappell or the federal judge's comments made contemporaneously with the imposition of Chappell's sentence.

As a general rule "[t]here is no general constitutional right to discovery in a criminal case and *Brady* did not create one. . . ." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42 (1977). Rather, *Brady* concerns those cases in which the government possesses information that the defense does not and the government's failure to disclose the information deprives the defendant of a fair trial. Therefore, reversal is required only where "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is the probability sufficient to undermine the confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985). Moreover, *Brady* only applies to "the discovery, *after trial,* of information which had been known to the prosecution but *unknown to the defense.*" *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976) (emphasis added).

Bowling's defense counsel knew that Chappell had been convicted in federal court and cross-examined him about the disposition of the charges. The defense, as conceded in Bowling's brief, could have—without the Commonwealth's assistance or permission—obtained the transcript of the federal sentencing hearing. Thus, in the case at bar, there could have been no *Brady* violation in connection with the federal charges against Chappell, because the information in question does not fall within the *Brady* rule.

**B. State Charges**

**1. Leslie County Charges**

Chappell's wife and a friend of his wife brought charges against Chappell in Leslie County. The charges were kidnapping, second-degree assault, and first-degree wanton endangerment and were ultimately dismissed. Chappell testified at Bowling's trial that the Leslie County charges against him were dismissed based on the request of the two women who brought the charges. Bowling argues that the Commonwealth should have discovered the reason for the dismissal of these charges and then turned this information over to the defense if it proved to be exculpatory under *Brady.* But as noted above, *Brady* turns on fair disclosure and does not create the right to discovery in a criminal trial. Further, it certainly does not create an obligation on the Commonwealth to perform the type of investigation suggested by Bowling here.

**2. Fayette County Charges**

At the time of Bowling's trial, Chappell had felony charges pending against him in Fayette County. The defense was unaware of these charges. Bowling argues that the Commonwealth should have disclosed information regarding the pending charges to the defense because they were admissible to show bias. That is, evidence of the pending charges would have shown that Chappell had a motive to curry favor with the Commonwealth's Attorney prosecuting Bowling's case, Tom Handy, in order to receive lenient disposition of the charges.

There is authority to support the proposition that "knowledge may be imputed to the prosecutor, or a duty to search may be

imposed, in cases where a search for readily available background information is routinely performed, such as routine criminal background checks of witnesses." *Odle v. Calderon,* 65 F.Supp.2d 1065 (N.D.Cal. 1999) (citing cases). On the other hand, the government has no duty to disclose what it does not know and could not have reasonably discovered. *Id.* Absent a showing that the prosecution would have turned up an indictment pending in a different county as part of a routine criminal background check, knowledge of the indictment cannot be imputed upon the prosecution. *Vega v. Johnson,* 149 F.3d 354, 363 (5th Cir.1998), *cert. denied,* 525 U.S. 1119, 119 S.Ct. 899, 142 L.Ed.2d 899 (1999). As there is no demonstration that a routine background check would have uncovered the pending indictments or that Handy had actual knowledge of the pending indictment, no *Brady* violation has been shown. *Id.* Further, even if known or discoverable, the indictments were not admissible.

 Indictments are admissible to show bias. *Adcock v. Commonwealth,* Ky., 702 S.W.2d 440, 441 (1986). That is, an indictment is admissible when it tends to show that a witness's "testimony may have been influenced by a desire to seek the favor or leniency of the prosecuting officer." *Chesapeake & O. Ry. Co. v. Pittman,* 283 Ky. 63, 138 S.W.2d 962, 964 (1940); *see also Spears v. Commonwealth,* Ky.App., 558 S.W.2d 641, 642 (1977) (An indictment, though not admissible as impeachment evidence, is admissible "to show that the testimony of the prosecuting witness was influenced by a desire to seek the favor or leniency of the prosecuting officer."). In this case, the pending Fayette County indictment would not have shown Chappell's bias.

Bowling's case was tried in the Laurel Circuit Court. Handy, whose jurisdiction does not extend to Fayette County, was not in a position to grant any favor or leniency to Chappell in connection with the charges pending against Chappell in the Fayette Circuit Court. Since there was no connection between Handy and the case against Chappell in Fayette County, the pending Fayette County indictments were not admissible. On appeal, Bowling argues that there was a connection. But the only support he offers for this claim is a letter written by Handy to the Fayette Circuit judge who sentenced Chappell, after Chappell had pled guilty to reduced charges. This letter does not support Bowling's claims.

While the letter does request the trial court to show Chappell some consideration for his cooperation in Bowling's trial, the consideration Handy asked for was not for a more lenient sentence; rather, it was that the sentencing court urge additional protection for Chappell during his incarceration. Further, the letter states in pertinent part: "No one knew Mr. Chappell nor did Mr. Chappell ever request or receive any favorable treatment by the Commonwealth, or law enforcement as a result of his testimony." There was no *Brady* violation in connection with the charges pending against Chappell in Fayette County.

## II. *INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS GUILT/IN- NOCENCE PHASE*

Bowling raises nine (9) separate ineffective assistance of counsel claims. We apply the *Strickland* standard and address each claim separately below. The *Strickland* standard sets forth a two-prong test for ineffective assistance of counsel:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466· U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). To show prejudice, the

> defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is the probability sufficient to undermine the confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 695.

### A. *Gilbert Jones*

■ Bowling argues that his trial counsel was ineffective for failing to call Gilbert Jones as a witness. We disagree.

Bowling, Chappell, and Jones were all held at the Laurel County Jail at the same time. Before Bowling's trial, Jones informed Bowling's defense counsel that he heard Chappell say that he (Chappell) intended to make up information about Bowling in order to help himself. Thus, this testimony would have impeached Chappell's testimony to a degree. At the evidentiary hearing on Bowling's RCr 11.42 motion, defense counsel testified that he thought that Jones's testimony would have been unpersuasive because he would have had to argue, "Don't believe this felon [Chappell], believe my felon [Jones]." Based on this testimony, the trial court ruled that the decision not to call Jones was reasonable trial strategy.

Bowling argues that this ruling was incorrect because it ignores the value of Jones's testimony relative to the value of Chappell's testimony. Bowling argues that, because Chappell stood to gain something and Jones did not, the jury would have believed Jones instead of Chappell. Further, Bowling argues that, had defense counsel properly investigated Chappell, counsel would have discovered that Chappell had in fact traded his testimony for lenient treatment. This, Bowling argues, would have made Chappell less credible than Jones.

We do not believe that Bowling has overcome the strong presumption that counsel was effective in connection with this issue. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Therefore, we hold that the decision not to call Jones as a witness was not ineffective assistance of counsel.

### B. *Prior Bad Acts*

■ The charges against Bowling concern two separate crime scenes. The first set of charges relate to a robbery and burglary at Jones's Chevron Station in Laurel County, in which the service station attendant was murdered. These crimes occurred on January 20, 1989. The second set of charges relate to a robbery and burglary at the Hensley Spur Station in Laurel County, in which the service station attendant was murdered. These crimes occurred on February 22, 1989. Prior to trial, the defense moved in limine to exclude any evidence of the shooting incident that occurred three days after the Hensley crimes occurred. We explained this evidence on direct appeal:

> Rickey Smith, who owned and operated the Quality Sunoco Service Station in Mt. Vernon (Rockcastle County), Kentucky, testified as to events which occurred at his station soon after he opened around 6:00 a.m. on February 25, 1989, three days after the Hensley murder in Laurel County. After open-

ing the station, but before putting out the equipment and displays, he saw a car pulling on to the lot. He waited at his desk and the driver came in and asked about getting a job. At trial, Smith identified the driver as the appellant. Smith testified that the appellant asked if the station ever had two employees on duty at the same time, to which Smith answered in the negative. The appellant kept looking out the window of the service station at the road and the driveway. As he started to leave the station, the appellant pulled out a revolver and began shooting at Smith until he ran out of bullets. Smith stated that he dove behind a metal desk and hit the floor face down. As soon as he heard the appellant stop shooting, he pulled out his own revolver and returned shots. Smith observed the appellant run to his car and drive off. This incident occurred only three days after the murder of Marvin Hensley.

*Bowling,* 942 S.W.2d at 300.

The trial court denied the motion in limine and admitted the evidence of the Rockcastle County shooting[1] because it rebutted Bowling's claims that he did not have a handgun, and because forensic evidence linked Bowling to the charges involving the Laurel County crimes at Jones's Chevron and the Hensley Spur Station. On direct appeal, we affirmed the trial court's ruling that evidence of the Sunoco shooting was admissible:

> The evidence pertaining to the appellant's attempted murder of Rickey Smith at the Mt. Vernon Sunoco Service Station was sufficiently probative under KRE 404(b). Forensic evidence linked the same handgun and bullets used at Rickey Smith's service station to the murder of Ronald Smith at the Jones' Chevron service station, to the murder of Marvin Hensley at the Hensley Spur Station, and to bullets found in possession of the appellant. The three incidents were sufficiently similar and interrelated for an inference that all three were committed by the same perpetrator. Moreover, there is a remarkable similarity between the respective crimes in Laurel and Rockcastle counties. In each, a lone service station operator was robbed during the early morning and shot with the same weapon.

*Bowling,* 942 S.W.2d at 301.

Bowling argues that the Commonwealth's Attorney improperly argued that the Sunoco shooting was so similar to the crimes for which Bowling stood charged that all three crimes had to have been committed by the same person. Bowling argues that this was contrary to the trial court's ruling and that his counsel was ineffective for failing to object to this argument. But as shown above, we held on direct appeal that the evidence was admissible for this purpose, *i.e.,* the Sunoco shooting was so similar to the shootings and robberies of the other stations that it was admissible as a modus operandi that was proof of Bowling's identity as perpetrator of the two charged robberies and murders. *See, e.g., United States v. Myers,* 550 F.2d 1036, 1045 (5th Cir.1977), which states:

> The probity of evidence of other crimes where introduced [to prove identity] depends upon both the uniqueness of the modus operandi and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime

---

1. From the record, it appears that Bowling was indicted for this shooting, but, because the shooting occurred in Rockcastle County, the indictment was not joined with the two Laurel County indictments.

and the other crimes be identical in every detail. But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person.

(Internal citations omitted).

■■■ There could have been no ineffective assistance of counsel in connection with this claim because failure to object to admissible evidence cannot result in ineffective assistance of counsel.

C. *Bullet Composition Evidence*

■■■ Donald Havekost testified as an expert for the Commonwealth. Havekost, at the time of Bowling's trial, was assigned to the scientific analysis section of the F.B.I. Laboratory in Washington, D.C. His testimony concerned compositional analysis of bullets recovered from the Jones's Chevron crime scene, from the Hensley Spur Station crime scene, from the Sunoco shooting and from a partially filled box of .38 special ammunition recovered from Bowling. Using this analysis, Havekost matched (a) one of the bullets recovered from Jones's Chevron with a bullet recovered from the Hensley Spur Station; (b) three of the bullets recovered from the Hensley Spur Station with three of the bullets recovered from the Sunoco Station; (c) two other bullets recovered from the Hensley Spur Station with another one of the bullets recovered from the Sunoco shooting, and matched those three bullets with three of the bullets contained in Bowling's box of ammunition; and (d) another one of the bullets recovered from the Sunoco shooting with five other bullets contained in Bowling's ammunition box. Thus, Havekost was able to link, either directly or indirectly, unused ammunition found in Bowling's possession with spent ammunition found at the two charged crime scenes and the uncharged Sunoco crime scene.

At a pretrial hearing on February 28, 1992, defense counsel moved for an independent examination of physical evidence including an examination of bullets and bullet fragments held by the Commonwealth as evidence against Bowling. The Commonwealth noted that discovery was made to the defense two years prior, but had no objection. The Commonwealth also argued that the court had no power to order the F.B.I. to test the evidence. After renewing the motion for independent analysis on July 6, 1992, the trial court granted the motion for independent analysis on July 9, 1992. On August 5, 1992, the trial court entered an order to transport evidence to the state facilities Jefferson Regional Forensic Laboratory. The bullets and bullet fragments examined by Havekost were included on the inventory sheet of evidence to be transported. Further, the order stated that the report from the tests were to be sent only to defense counsel.

At the RCr 11.42 evidentiary hearing, defense counsel testified that he agreed to the use of the state facilities because of his interpretation of the applicable law at the time, which—according to the legislative history of KRS 31.185—provided in pertinent part:

Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the commonwealth. If he considers their use impractical, the court concerned may authorize the use of private facilities to be paid for on court order by the county.

1974 Kentucky Acts, Ch. 358, § 11. Thus, defense counsel's decision to allow the bullets and bullet fragments to be sent to the

same laboratory that the Commonwealth used, was reasonable.

The Jefferson Regional Forensic Laboratory was unable to perform the bullet composition analysis. While the laboratory was able to forward the evidence to the F.B.I. for bullet composition analysis when the Commonwealth submitted the evidence, for whatever reason, it was unable to forward the evidence to the F.B.I. when the defense submitted the evidence.

It became clear that the Jefferson Regional Forensic Laboratory was unable to do the bullet composition analysis or forward the evidence to the F.B.I. So, on September 9, 1992, defense counsel again moved for independent analysis using an independent expert. The trial court granted the motion, but in so doing, advised, "... but the Court would make it clear and in fact that it does, that in the event that this cannot, they cannot be back, does not mean that the Court will continue the case because of the lateness of the motion." On the same day, the trial court entered an order that stated in pertinent part:

> It is hereby ordered that pursuant to KRS 31.185, the defendant shall be allowed funds to employ the University Analytical Microscopy Associates, Inc. to examine some evidence previously examined by the F.B.I. Laboratory. It was determined that the state facilities were incapable of performing said examinations and that the F.B.I. would not re-examine the evidence.... The evidence shall be examined by Dr. Allen Dozier....

Pursuant to the above order, the bullet evidence was transported to an independent laboratory on September 14, 1992. Fifteen days later, the trial court ordered that the evidence sent to Dr. Dozier be returned to the Laurel Circuit Court to be held in evidence for Bowling's trial. Apparently, Dr. Dozier did no testing on the evidence during the time it was in his possession.

In his RCr 11.42 motion and on appeal, Bowling argues that defense counsel was ineffective for failing to ensure that the independent testing of the bullets and fragment evidence be performed. Or, in the alternative, Bowling argues that defense counsel was ineffective for failing to move for a continuance once it became clear that Dr. Dozier did not test the evidence.

Bowling's first argument has no merit. Defense counsel recognized the importance of the bullet composition evidence and repeatedly moved the court for independent analysis of the evidence. Next, the record reveals that the trial court affirmatively stated that it would not grant a continuance if the testing could not be done before trial. It is not ineffective assistance of counsel to fail to perform a futile act. Further, nothing in the record supports a finding that independent analysis would have yielded evidence favorable to the defense.

In connection with his RCr 11.42 motion, Bowling moved for expenses to hire an expert witness to examine the bullets and bullet fragments. As part of this motion, Bowling tendered the vita of Robert J. Block, who holds a Ph.D. in metallurgical engineering. Additionally, Bowling tendered a document prepared by Dr. Block entitled: "Review of the F.B.I. Determination Regarding the Significance of the Chemical Analysis Results Obtained from 39 Bullets." In this document, Dr. Block acknowledged that the procedures used by Havekost to obtain the bullet matches were valid. But Dr. Block questioned the confidence level of the matches obtained by Havekost. Further, Dr. Block questioned Havekost's decision to perform analysis on three different points in each

bullet or fragment. Dr. Block argued that using five different points would have produced a higher degree of confidence in the results.

Dr. Block next attacked the results obtained by Havekost using his (Block's) own statistical analysis of the results of the chemical compositions of the bullets and fragments obtained by Havekost. While Havekost determined that there were seven (7) unique groupings among the bullets and fragments, Dr. Block determined that there were only three (3) unique groupings. This, of course, casts doubt on Havekost's analysis of the data. Block's attack on the interpretation of the data dovetails with Bowling's argument in this appeal that the methodology and basis of Havekost's testimony were not reliable. This argument questions the admissibility of Havekost's testimony. Likewise, his other arguments attack the admissibility of the bullet composition evidence: (1) there was no statistical evidence introduced evidencing the reliability of the "matching" of the bullets and bullet fragments; (2) that Havekost did not testify as to how many bullets are shipped for sale in a single consignment or in what quantity the manufacturer boxes the bullets; and (3) that Havekost had no established expertise in the pattern and practice of the business of manufacturing bullets either industry wide, or by the specific manufacturer Havekost identified as making all the bullets he tested.

■ The admissibility of Havekost's testimony could have been raised on direct appeal. This is true even though defense counsel did not object to its introduction at trial. *See, e.g., Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 668 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). Thus, the issue cannot be raised or addressed in this appeal from the denial of Bowling's RCr 11.42 motion.

*See Haight v. Commonwealth,* Ky., 41 S.W.3d 436, 441 (2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 471, 151 L.Ed.2d 386 (2001), which holds that an RCr 11.42 motion is limited to issues that were not and could not have been raised on direct appeal. Bowling's argument that defense counsel was ineffective for failing to ensure that the bullets and fragments were independently analyzed appears to be an attempt to circumvent this rule. If so, the attempt fails.

■ Assuming arguendo that counsel was deficient, there is no showing of prejudice to Bowling. What an independent analysis of the bullets and fragment evidence would have revealed is pure speculation. It may have been beneficial to the defense. On the other hand, independent analysis may have increased the level of confidence in Havekost's results. Moreover, as Dr. Block's report reveals, Bowling's main point of contention with the accuracy of Havekost's testimony lies not with the actual results of Havekost's chemical analysis, but rather with Havekost's interpretation of the data. Thus, independent analysis of the bullets and fragments was not necessary to dispute Havekost's grouping results. Therefore, we hold in the alternative there is not a reasonable probability that the outcome of Bowling's trial would have been different had an independent examination of the bullets and fragment evidence been performed.

### D. *Edward Eugene Herren*

■ Bowling argues that defense counsel failed to interview Herren prior to his trial testimony and that this resulted in ineffective assistance of counsel. We disagree.

Herren delivered the Corbin *Times Tribune* to Jones's Chevron during the period when the crimes for which Bowling was convicted occurred. On January 19,

1989, Herren overheard two men talking in the public restroom at Jones's Chevron. One of the men said, "The [MF] is fried," and formed his hand into the shape of a gun. Jones's Chevron was robbed the next day and the attendant on duty was shot and killed.

The defense called Herren as a witness. Herren related the threatening comment he overheard, the concurrent hand gesture, and a physical description of the two men engaged in the conversation. Herren testified that he was positive that neither man was Bowling. Further, he testified that this occurred before the robbery and shooting. But on cross-examination, he testified that he heard the threat *after* the robbery and murder and not *before* as he had testified on direct examination. Herren admitted on the stand that this rendered his testimony meaningless. This contradictory testimony was based on questions by the Commonwealth concerning dates contained in a police report. The dates on the police report were incorrect. If correct, the dates would not have impeached Herren's testimony as to when the events occurred.

Bowling argues defense counsel failed to interview Herren prior to trial. Further, he argues that, had defense counsel interviewed Herren and investigated the dates in the report, then the confusion concerning the dates would not have occurred or could have been cleared up easily on redirect. This, Bowling argues, was deficient performance that deprived him of effective assistance of counsel. The trial court found that defense counsel and Herren had discussed Herren's testimony prior to Bowling's trial. Further, the trial court concluded that additional or contradictory testimony elicited on cross-examination was not counsel error.

There is sufficient evidence in the record to support the trial court's finding of fact.

Thus, the finding of fact was not abuse of discretion. Therefore, we affirm the trial court on this basis. Further, even if there was no support for either the trial court's findings or conclusions on this issue, the alleged failure to interview Herren could not rise to the level of ineffective assistance. Herren's testimony had little or no probative value. There is not a reasonable probability that, had Herren's testimony been corrected, the result of Bowling's trial would have been different.

E. *Randy Harris*

Randy Harris contacted the police after the robbery and murder at Jones's Chevron. Harris told the police that he stopped briefly at the service station to buy cigarettes, but he changed his mind and drove off without going inside. As he was driving away, he saw a man run out of the service station, jump into an old green car, and drive away. While stopped at a red light, Harris was able to observe this man. While Harris could not identify the man, he was certain that it was not Bowling. According to Harris, these events occurred at approximately the same time that Jones's Chevron was robbed.

Harris was a convicted felon who resided at the time in Virginia. Defense counsel contacted Harris in Virginia and asked whether he would be willing to testify on Bowling's behalf. Harris indicated that he would not come voluntarily, but that he would honor a subpoena. Apparently, defense counsel began preparing a subpoena for Harris but never completed the task.

Bowling argues that defense counsel was deficient for failing to subpoena Harris as a witness under the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings. KRS 421.230–270. In ruling on Bowling's RCr 11.42 motion, the trial court denied relief: "It is speculative as to

whether or not [the KRS 421.250] procedure would have been successful, and even if Mr. Harris'[s] attendance had been procured, whether or not it would have affected the outcome . . . ."

▇ KRS 421.250(1) requires that a motion be made with the trial court, in which a proceeding is pending, to certify that a witness is material and necessary to the proceeding. The party wishing to subpoena the witness has the burden of showing materiality. *Dillingham v. Commonwealth*, Ky., 995 S.W.2d 377, 382 (1999). Once certification of materiality is obtained, it is presented to a court of record in which the witness is found. *Id.* The out-of-state court must then make an independent determination as to whether the witness is material and as to whether compelling the witness to attend would cause the witness undue hardship. *Id.* The ruling of the out-of-state court cannot be challenged in or reviewed by a court in the Commonwealth of Kentucky. *Id.*

The materiality of Harris's testimony—the out-of-state witness in this case—is far from apparent on its face. And, of course, there is no basis to consider how an out-of-state court would have ruled on the question of undue hardship. Therefore, we agree with the trial court that it is speculative as to whether Harris's attendance at Bowling's trial could have been secured under the Uniform Act. Consequently, whether Bowling was prejudiced by the failure to subpoena Harris cannot be determined. Just as there can be no ineffective assistance of counsel for failing to object to admissible evidence, *Commonwealth v. Davis*, Ky., 14 S.W.3d 9, 11 (1999), there can be no ineffective assistance for failing to attempt to introduce inadmissible evidence or in failing to subpoena a witness whose attendance at trial cannot be secured.

F. *April Lunsford*

▇ April Lunsford testified for the defense and provided an alibi for Bowling for the time when the Hensley Spur Station crimes were committed. On cross-examination, the Commonwealth questioned her about a recent arrest, which was for operating a motor vehicle without a license. She was with Bowling's brother, John Bowling, when she was arrested. Additionally, the Commonwealth questioned her about a note found in her purse when she was arrested. The note read: "You are being watched by a .38 special, thank you, John Bowling."

Bowling argues that defense counsel should have learned the nature of Lunsford's arrest. Further, he argues that defense counsel should have moved for a continuance to question Lunsford in private about the meaning of the note signed by John Bowling. Unlike the argument concerning Edward Herren, Bowling's argument is not that counsel failed to confer with Lunsford before she testified. Rather, Bowling argues that defense counsel failed to elicit all pertinent information, including any possible impeachment evidence, while conferring with her.

Bowling would set the bar for effective assistance of counsel too high. He would have us move toward requiring near perfect performance by defense counsel, viewed with the benefit of hindsight. This is contrary to the *Strickland* standard, which requires not optimal performance but, rather, reasonably effective assistance. *See, e.g., Fields v. Bagley*, 275 F.3d 478, 484 (6th Cir.2001). While perhaps not perfect, defense counsel's preparation and questioning of Lunsford was reasonably effective under *Strickland*. Therefore, we affirm the trial court's ruling that there was no ineffective assistance of counsel concerning Lunsford.

G. *Handicapped Jurors*

Bowling argues that defense counsel was ineffective for failing to object to the trial court's excusal of two handicapped jurors before voir dire because the courthouse elevator was not working. The trial court found that there was no evidence in the record to support this claim. Likewise, we find the record to be silent on the issue. Thus, the trial court's finding of fact on this issue was not clearly erroneous. We affirm the trial court's ruling that there was no factual support for Bowling's ineffective assistance of counsel claim on this issue.

### H. *Juror Siner*

Bowling argues that Ena Siner stated in voir dire that she could not consider the full range of penalties. Bowling argues that there was ineffective assistance due to the failure to either move to strike Siner for cause, or to use a peremptory strike to remove her from the jury. The trial court found that this claim was not supported by the record and that Siner did state that she could give consideration to the full range of penalties. This finding of fact is not clearly erroneous. Therefore, we affirm the trial court's ruling that there could have been no ineffective assistance of counsel on this issue.

### I. *Alibi Instruction*

 Bowling argues that defense counsel was ineffective for failing to request an alibi instruction. This issue was not raised in Bowling's RCr 11.42 motion and, therefore, is not properly before this Court. *See West v. Commonwealth*, Ky., 780 S.W.2d 600, 602 (1989), *cert. denied*, 518 U.S. 1027, 116 S.Ct. 2569, 135 L.Ed.2d 1086 (1996). The issue will not be considered or discussed further.

### III. *THE RCr 11.42 HEARING*

Bowling raises a number of arguments that allege deprivation of various constitu-

tional rights at his RCr 11.42 hearing. We address each below.

### A. *Recusal of the Trial Judge*

 Bowling argues that the trial judge should have recused himself from presiding over the RCr 11.42 hearing. We disagree.

Bowling argues that the trial judge was a material witness at the hearing. The record does not support this claim.

Bowling argues that, by questioning certain witnesses at length, the trial judge created the appearance that he was taking sides. The cases Bowling cites in support of his argument all concern jury trials. *See, e.g., United States v. Sheldon*, 544 F.2d 213 (5th Cir.1976). The core issue in these cases is whether the judge's questions had a prejudicial impact on the jury. But in this case, there was no jury. Thus, no jury impact concerns are present here. Further, we believe that the trial court did not exceed its authorization to interrogate witnesses in this case.

 The trial court is authorized by KRE 614 to question witnesses. When the trial court acts as the trier of fact, the extent of examination of witnesses by the presiding judge is left to the trial judge's discretion. *See, e.g., United States v. McCarthy*, 196 F.2d 616, 619 (7th Cir. 1952); *Jordan v. Guinn*, 253 Ark. 315, 485 S.W.2d 715, 719 (1972). Our review of the record does not show that the questions asked of witnesses or the extent of the questioning by the trial judge was an abuse of discretion.

### B. *Disqualification of the Commonwealth's Attorney*

 Bowling argues that the trial court erred in denying his motion to disqualify Commonwealth's Attorney, Tom Handy, from representing the Commonwealth in the evidentiary hearing on the

RCr 11.42 motion. While we agree with the trial court's ruling, we believe that Handy should have disqualified himself. But, based upon the facts of this case, we can offer Bowling no relief.

Prior to the evidentiary hearing on his RCr 11.42 motion, Bowling filed a motion for the trial court to recuse Handy because he was going to be a material witness at the hearing. This motion was based on defense counsel's stated intention to call Handy as a witness in connection with the alleged *Brady* violations outlined above and additional allegations of prosecutorial misconduct in connection with two witnesses who testified at trial. At a pre-hearing conference, the Commonwealth urged the trial court to deny the motion. The Commonwealth argued that Handy was not the only witness available to testify to the matters alleged in Bowling's RCr 11.42 motion. Further, the Commonwealth argued that to grant the motion would allow Bowling to control who prosecuted his case in the evidentiary hearing. The trial court denied the motion on grounds that Bowling had not established a sufficient basis to disqualify Handy.

KRS 15.733(3) provides: "Any prosecuting attorney may be disqualified by the court in which the proceeding is presently pending, upon a showing of actual prejudice." We cannot say that the trial court erred in concluding that no actual prejudice had been shown by the defense, especially in light of the Commonwealth's assertion that other witnesses were available to testify about the relevant matters. But KRS 15.733(2)(d) provides in pertinent part: "Any prosecuting attorney shall disqualify himself in any proceeding in which he . . . [i]s to the prosecuting attorney's knowledge likely to be a material witness in the proceeding."

Contrary to the Commonwealth's assurances at the pre-hearing conference, Handy did testify at Bowling's evidentiary hearing about material matters involving Bowling's allegations. At some point, Handy should have disqualified himself, but we do not believe that Handy's failure to disqualify himself unduly prejudiced Bowling. This was an evidentiary hearing in which a judge was the trier of fact, and not a trial by jury. Further, Bowling had the burden of proof at the hearing and not the Commonwealth. The trial judge in this case is a seasoned and able judge. We have no doubt that he was not unduly influenced by Handy's participation as both prosecutor and witness in this case.

### C. Other Claims

#### 1. Continuance

 Bowling argues that the trial court erred in not granting a continuance because defense counsel wanted to (1) locate and subpoena additional witnesses, (2) investigate the disposition of the Fayette County charges against Chappell, (3) confer further with Bowling prior to the hearing, (4) further investigate the exclusion of disabled jurors claim, and (5) investigate whether there were two different serial numbers for the gun linked to Bowling at trial. Whether to grant a motion for continuance is well within the sound discretion of the trial court. *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1983); *Crawford v. Commonwealth*, Ky., 824 S.W.2d 847, 850–51 (1992). Thus, a trial court's ruling on a continuance motion will remain undisturbed unless it appears to the appellate court that, in overruling the motion, there was a clear abuse of judicial discretion such as to deny the accused substantial justice. *Hunter v. Commonwealth*, Ky., 869 S.W.2d 719, 721 (1994). There was no abuse of discretion in this case.

An RCr 11.42 motion provides a forum for known grievances. *Gilliam v. Com-*

*monwealth*, Ky., 652 S.W.2d 856, 858 (1983). It does not provide an opportunity to search for or discover new grievances. *Id.* Therefore, there could be no abuse of discretion for failing to grant a continuance to investigate new claims or search for evidence to support suspected claims. As for any grounds that did not fall into the previous category, there was no clear abuse of discretion for failing to grant Bowling's motion for a continuance.

### 2. *Refusal to Allow Avowal Testimony*

■■■ Bowling argues that the trial court prevented him from putting on avowal testimony concerning his claim of ineffective assistance of appellate counsel. An RCr 11.42 motion cannot be used as a vehicle for relief from ineffective assistance of appellate counsel. *Harper v. Commonwealth*, Ky., 978 S.W.2d 311, 318 (1998), *cert. denied*, 526 U.S. 1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). Thus, there was no cognizable error to preserve and allowing the avowal testimony would have been an act of futility.

### 3. *In Camera Review*

The trial court denied Bowling's motion for an in camera review of files from Fayette County concerning the disposition of the charges against Chappell. As discussed above, the Fayette County indictments against Chappell were not admissible at Bowling's trial. Consequently, there was no reason to review the files. There was no error.

### 4. *Motion for Exculpatory Evidence*

Bowling moved the trial court to order the Commonwealth to disclose exculpatory evidence. The motion appears to be nothing more than an attempt to discover new grounds for relief. Therefore, the motion was outside the scope of the purpose of the RCr 11.42 motion.

### 5. *Neuropsychologist*

Bowling moved for the appointment of a neuropsychologist to assist in supporting claims that defense counsel was ineffective for failing to investigate and put on mitigating psychological evidence during the penalty phase of Bowling's trial. The trial court denied the motion stating, "There is no evidence that defense counsel was ineffective in investigating [Bowling's] background." Thus, the trial court's ruling was that Bowling failed to show that the expenses for the expert funding were necessary.

A needy or indigent person charged with a serious crime is entitled to "be provided with the necessary services and facilities of representation including investigation and other preparation." KRS 31.110(1)(b). "Necessary services" has been construed to mean "reasonably necessary." *Hicks v. Commonwealth*, Ky., 670 S.W.2d 837, 838 (1984), *cert. denied*, 469 U.S. 1040, 105 S.Ct. 521, 83 L.Ed.2d 409 (1984). In light of our holding concerning defense counsel's investigation and presentation of mitigating evidence in the penalty phase of Bowling's trial, *see Part IV, infra*, we conclude that the funds for a neuropsychologist were not reasonably necessary. Therefore, we hold that the trial court did not err in denying the motion for funds.

### 6. *Failure to Enforce Subpoena*

■■■ Beverly Lewis was a friend of Chappell's ex-wife. Chappell was charged in Leslie County with assaulting Lewis. As discussed above, the Leslie County charges against Chappell were ultimately dismissed. As explained in Bowling's brief, Lewis would have testified that Chappell hit her over the head with a lead pipe and that she did not know why the charges against Chappell were dismissed. Bowling argues that this testimony would have supported his allegations that defense counsel was ineffective for failing to investigate the dismissal of the Leslie County charges.

The trial court ruled that there was no ineffective assistance of counsel in connection with the Leslie County charges and, thus, there was no reason to take Lewis's testimony. Like the trial court, we have strong doubts as to whether Lewis's testimony, as outlined in Bowling's brief, would have been admissible at Bowling's trial. Even if admissible, there is not a reasonable probability that the results of Bowling's trial would have been different had Lewis testified.

### 7. *Unsupported Errors*

Bowling raises a number of additional allegations of trial court error that are unsupported by law or by any argument in his brief, or both. These issues include: denying Bowling's motion to lift the standing order prohibiting contacts with the jury; granting the Commonwealth's motion to prohibit ex parte proceedings; denying Bowling's motion to supplement the record; limitation of defense counsel's questioning of Bowling's trial defense counsel; preventing Bowling from presenting the testimony of Bowling's brother John; and allowing the prosecutor to cross-examine a defense witness before the direct examination of the witness. We see no reason to discuss these issues further.

## IV. *INEFFECTIVE ASSISTANCE OF COUNSEL—PENALTY PHASE*

Bowling argues that his defense counsel was ineffective in the penalty phase of his trial. The arguments center upon Bowling's mental condition. Bowling argues that his defense counsel should have investigated a prior spinal cord injury, prior head injuries and any possible resulting brain damage. He argues that defense counsel should have procured an independent neuropsychologist to examine Bowling for possible mitigating evidence. We disagree.

The substance of Bowling's argument is that the trial court erred in denying defense counsel's motion to proceed ex parte and in denying defense counsel's motion for an independent expert. Additionally, Bowling argues that it was error to designate the KCPC to provide expert assistance to Bowling because such a role is outside the scope of the KCPC's mission. These are all errors that could have and should have been raised on direct appeal. Indeed, Bowling argues that he was denied effective assistance of *appellate* counsel for failing to raise these issues on direct appeal.

Bowling attempts to circumvent the rule that claims that could have been brought on direct appeal cannot be raised in an RCr 11.42 motion, arguing that defense counsel should have been more persistent in demanding expert funds for a neuropsychologist.

Under *Strickland,* defense counsel has an affirmative duty to make reasonable investigation for mitigating evidence or to make a reasonable decision that particular investigation is not necessary. *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 696. The reasonableness of counsel's investigation depends on the circumstances of the case. *Id.* at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. As shown by the following chronology, we believe that defense counsel's investigation into psychological mitigating evidence was reasonable.

April 11, 1991: Defense counsel files a motion for the trial court to hold ex parte hearings on defense motions for funds for expert witnesses.

April 12, 1991: Citing *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the trial court grants the defense motion for ex parte hearings.

August 4, 1992: Defense counsel makes a pretrial motion for an ex parte hearing on a defense motion for funding for an expert witness to assist the defense in the penalty phase. In support of the necessity of holding the hearing ex parte, defense counsel specifically states that he needed the assistance of a doctor who was "learned in the particular field of neuropsychology." Defense counsel argues that this expertise was necessary to determine the "profound effect" that Bowling's spinal cord injury may have had on his subsequent behavior. The trial court denies the defense's motion to proceed ex parte because defense has not shown sufficient grounds for granting the motion. But the trial court does not preclude the defense the right to proceed ex parte in the future.

August 5, 1992: The trial court enters an "Order directing the Kentucky Correctional Psychiatric Center [KCPC] to Assist the Accused." The order specifically states that the KCPC

> is hereby ordered to designate a psychiatrist and/or psychologist to serve as an expert witness for the accused. This expert is not to communicate with the prosecuting authorities of the Commonwealth in any manner in this case, or any other case involving the same accused.

The order further provides:

> The expert will examine the accused thoroughly, and will devote particular attention to the organic head trauma suffered by the accused, and the effect this has had on the accused's behavior. The expert will also provide an accurate assessment of the accused's intelligence. The expert will also provide an accurate multi-axial diagnosis of the accused. The expert will [use] all good faith efforts to discover all things relevant to the presentation of a mitigation case by the accused, assuming that this case reaches a penalty phase.

In view of the record and foregoing, we affirm the trial court's ruling on these issues.

## V. FINAL ISSUES

### A. Prior Bad Acts—Penalty Phase

■■■ Bowling argues that the trial court erred in failing to admonish the jury that it could not consider, in the penalty phase, the testimony that Bowling was responsible for the uncharged Sunoco Service Station shooting. The admonition would have been redundant in light of the trial court's prior admonition to the jury in the guilt/innocence phase that the testimony was not to be considered as evidence of Bowling's guilt. Further, in light of our holding on direct appeal that the testimony was admissible as substantive evidence against Bowling, any error in failing to admonish the jury was harmless.

### B. Incorrect Standard

Bowling argues that the trial court used the wrong standard when it ruled on his allegations concerning the improper exclusion of handicapped jurors. But the ruling complained of was an alternative ruling: "... even if the record did indicate that these two handicapped jurors were excused, there's nothing to indicate in this record ... that Mr. Bowling was denied his right to a fair trial." As stated above, we affirmed the trial court's ruling on this issue based on its finding that there was no evidence in the record to support the claim. Therefore, whether the trial court used an erroneous standard in its alternative holding is not relevant.

For the reasons set forth above, we affirm the Laurel Circuit Court's denial of Bowling's RCr 11.42 motion.

COOPER, GRAVES, KELLER, and WINTERSHEIMER, JJ., concur.

STUMBO, J., concurs in result only.

LAMBERT, C.J., not sitting.