RENDERED:  MAY 21, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1875-MR

JESSICA HAILEY ROBINSON                                        APPELLANT

v.
APPEAL FROM ROCKCASTLE CIRCUIT COURT
HONORABLE JEFFREY T. BURDETTE, JUDGE
ACTION NO. 12-CR-00017-002

COMMONWEALTH OF KENTUCKY                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  JONES, MAZE, AND TAYLOR, JUDGES.

JONES, JUDGE:  Jessica Robinson appeals from the order entered by the

Rockcastle Circuit Court denying her motion to vacate, set aside, or correct

sentence pursuant to RCr[1] 11.42 and CR[2] 60.02.  Following review of the record,

briefs, and law, we affirm.

---

[1] Kentucky Rules of Criminal Procedure.

[2] Kentucky Rules of Civil Procedure.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The factual background and relevant trial testimony were summarized

by the Kentucky Supreme Court as part of its direct review of Robinson's

judgment of conviction and sentence. We adopt the Supreme Court's summary as

set forth below:

> In the days leading up the shooting death of Jackie
> Bullock, his "friends"—Bobby Peters, Hanna Hunsucker
> (Peters' girlfriend), Josh Cameron, Gary Lee Kirby, and
> Jessica Robinson—partied and consumed
> methamphetamine at Peters' house in Rockcastle County,
> Kentucky. At some point during this time, at least some
> members of the group hatched a plot to rob Bullock of
> his prescription pain pills and money. Bullock was
> known to fill prescriptions for pain pills in Georgia and
> was alleged to sell some of the drugs. The group
> believed Bullock had just returned from Georgia and
> believed he would have a ready supply of pills. The
> primary issue at trial was Robinson's role in this plot, and
> the evidence introduced at trial was conflicting on this
> point and others.
>
> On the evening of November 30, 2011, Bullock was at
> home—where he lived with his father—when Robinson
> called and invited him over to Peters' house. His father
> testified that Bullock left around 9:30 p.m., and
> according to his father, there was nothing unusual about
> that.
>
> According to one of several statements Robinson made to
> police, she called Bullock to get money for a medical
> appointment the next day. She also stated, in one of the
> statements, that Peters said something about robbing
> Bullock about thirty minutes before Bullock arrived, and
> Kirby said he would do it because he had a gun.
> Robinson claimed at times that she did not care whether

they robbed Bullock and at other times that she did not want them to rob him. She consistently stated that she did not help them do it.

According to statements from the others, however, Robinson had helped plan the robbery attempt, implying that the call to Bullock was part of that plan. They claimed that part of the impetus behind her participation was that Bullock had been claiming to have had sex with Robinson and Hunsucker, which angered them. The plan was to rob Bullock at Peters' house.

At some point after Bullock arrived at Peters' house, he and Robinson left in his car to get soda and cigarettes. They also stopped at a cemetery to talk. Bullock produced four pain pills, all he had, and they took them. While they were there, Robinson claimed, Hunsucker called her and told her that they were ready to rob Bullock.

According to Robinson, she told Hunsucker repeatedly that Bullock did not have his pills and tried to get them to not go forward with the robbery. Hunsucker, however, told Robinson that Kirby and Cameron were going to the cemetery to commit the robbery. According to Robinson, she told Bullock to go back to the house from the cemetery at that point to avoid the robbery. She claimed she was "scared" and "didn't want him to be robbed."

According to Josh Cameron, who was still at the house, the phone call was to let them know that the plan was "a go." He and Kirby donned masks and dark clothing and hid outside Peters' house by a fence, waiting for Bullock and Robinson to return.

Upon arriving back at the house, Bullock and Robinson went inside briefly. They found Hannah claiming Kirby was sick in a bathroom with the door closed. Bullock stayed for a short time, and then walked outside. At that

point, Robinson claimed, she discovered that Kirby was not in the bathroom.

Robinson's statements differed dramatically as to what she did next. She initially stated that she witnessed the robbery and shooting from inside the house looking through a window. Police confronted her with the fact that it would have been impossible for her to see the shooting from the angle she claimed, and she later changed her story. In later interviews, she claimed that she went back outside with Bullock because she was worried about something bad happening to him.

In her fourth interview, she denied getting in the car with Bullock to leave. She stated that she thought he was safe when she saw him drive off and that otherwise she would have tried to stop the robbery because she did not think the others would hurt her.

In her fifth interview, she finally admitted to getting into the car to leave with Bullock. She claimed that upon hearing that Kirby was in the bathroom (and knowing he was not), she was scared and went back outside, planning to leave with Bullock. She claimed she got in the car at that time but did not tell the victim that Kirby was not in the bathroom, because she did not want him to think she was involved in the robbery the others had planned. She seemed to think she could keep the robbery from happening by being in the car, stating that she wanted to "protect him" and that she wanted to "keep it all from happening without having to explain to him." (This seems to echo her comment in the fourth interview that she did not think the others would hurt her, which is why she thought she could stop the robbery if necessary.)

Regardless of which, if any, version of those events actually happened, there is little question what happened to Bullock. He got in his car to leave. After traveling a short distance down the driveway, Kirby and Cameron jumped out, and Kirby shot Bullock.

-4-

The car continued down the driveway and came to a stop after going through a fence. Robinson claimed in her last statement that she got blood on her shirt because she grabbed Bullock and that she thought he was dead before the car reached the end of the driveway. A neighbor who lived nearby testified to hearing a gunshot sometime between 10:00 p.m. and midnight.

According to Cameron, they had not intended to kill Bullock and had just wanted his pills and money. Peters also testified that their only intention was to take the victim's pills, believing it unlikely that Bullock would call the police about his pills being stolen because he was a drug dealer, but that the robbery had gone bad because they had been too long without sleep (and on methamphetamine). And Hunsucker testified that she did not know why Kirby killed Bullock and that she had been shocked and devastated by it. In her own statements, Robinson claimed not to know why Kirby pulled the trigger, though she suggested that it was because Bullock was not going to stop the car.

After the shooting, everyone returned to the house. Cameron had apparently taken the gun from Kirby, and he pointed it at all of them and threatened them not to say anything. All five then got in a car and left. They first dropped Cameron off somewhere, and he got rid of the gun (which was never recovered by police). Then Robinson and Kirby went to Robinson's boyfriend's house where, according to Robinson, Kirby made them burn his and her clothing and the mask. Robinson claimed that she revealed the shooting to her boyfriend and that she claimed, in Kirby's presence, that Kirby had shot Bullock for trying to rape her.

Bullock's car was found later that day, and it was initially believed that he died from wrecking his car. That he had been shot was not revealed until a medical examination. In fact, when Robinson first went to the police, claiming

she wanted to report a murder, they were not aware that Bullock had been killed.

In the course of the ensuing investigation, police found a bag in Peters' bedroom (which he shared with Hunsucker) containing items associated with drug use. A one-step meth lab was also found in the couple's room.

Each member of the group was indicted for murder, robbery, and various methamphetamine offenses. Peters, Hunsucker, and Cameron entered guilty pleas to complicity to murder. Peters and Cameron also pleaded guilty to methamphetamine offenses. They were sentenced to 20 years, 20 years, and 25 years, respectively. And all three testified for the Commonwealth at Robinson's trial. Kirby had also been convicted, albeit of murder as a principal, and refused to testify.

The jury found Robinson guilty of wanton murder, complicity to first-degree robbery, complicity to manufacturing methamphetamine, and being a second-degree persistent felony offender. The jury recommended prison sentences of 22 years for wanton murder, 10 years enhanced to 20 years for complicity to first-degree robbery, and 15 years enhanced to 22 years for complicity to manufacturing methamphetamine; and it recommended that these sentences run concurrently for a total prison sentence of 22 years. The trial court departed upward from the jury's recommendation, choosing instead to have four years of the methamphetamine sentence run consecutively to the murder sentence. Robinson was thus sentenced to a total of 26 years' imprisonment.

*Robinson v. Commonwealth*, No. 2013-SC-0728-MR, 2015 WL 5634398, at *1-3

(Ky. Sep. 24, 2015) (internal footnotes omitted).

On direct appeal, Robinson argued: (1) the circuit court erred in failing to grant a directed verdict on the manufacturing methamphetamine charge; (2) the circuit court should have severed the methamphetamine charge from the murder and robbery charges; (3) it was error to allow the Commonwealth to question Hunsucker about an uncharged and unrelated prior theft Robinson allegedly committed; and (4) the circuit court erred in refusing to instruct on criminal facilitation of the murder and the robbery.

Following its review of Robinson's various assignments of error, the Supreme Court affirmed Robinson's convictions for wanton murder and complicity to first-degree robbery; however, it reversed her conviction for complicity to manufacturing methamphetamine for insufficient evidence. The Court then remanded the matter to the circuit court "to amend the final judgment convicting Robinson of wanton murder and complicity to first-degree robbery to reflect the remaining sentence of 22 years' imprisonment for those offenses." *Id*. at \*11. On April 20, 2016, the circuit court resentenced Robison to 22 years' imprisonment in accordance with the Supreme Court's directive.

Robinson filed a motion to vacate, set aside, or correct sentence pursuant to CR 60.02 on October 14, 2018. Despite invoking CR 60.02 in the title of her motion, Robinson's opening paragraph stated she moved pursuant to RCr 11.42 and all applicable authority to vacate her sentence. Robinson alleged she

received ineffective assistance of counsel when (1) trial counsel failed to present evidence the victim, Jackie Bullock, had the prescription in his pocket; (2) trial counsel failed to request a renunciation instruction; (3) trial counsel failed to investigate and/or produce evidence from Robinson's probation officer; (4) trial counsel failed to effectively cross-examine Robinson's co-defendants with respect to their plea agreements; and (5) trial counsel opened the door to bad character evidence.[3]  Additionally, Robinson sought a new trial on the ground that her co-defendants were now ready to admit she did not participate in the crimes.

The circuit court reviewed Robinson's motion and determined that she was seeking relief pursuant to RCr 11.42 as stated in the body of her motion despite captioning the motion as being filed only pursuant to CR 60.02.  Next, it determined that it was unnecessary to hold an evidentiary hearing because all of Robinson's assignments of error were refuted by the record.  Thereafter, on December 6, 2019, the circuit court entered a detailed twenty-three-page order overruling Robinson's motion.  This appeal followed.

## II.    STANDARD OF REVIEW

This Court reviews a circuit court's denial of RCr 11.42 relief under an abuse of discretion standard.  *Bowling v. Commonwealth*, 981 S.W.2d 545, 548

---

[3] She also alleged the attorney of one of her co-defendants previously represented her in a criminal action, and this represented a conflict of interest.  She does not raise this for our review.

(Ky. 1998). An abuse of discretion has occurred when the circuit court's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

### III. ANALYSIS

### *a. Ineffective Assistance of Counsel*

To establish an ineffective assistance of counsel claim under RCr 11.42, a movant must satisfy a two-prong test showing both that counsel's performance was deficient, and that the deficiency caused actual prejudice resulting in a proceeding that was fundamentally unfair, and, as a result, was unreliable. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). As explained in *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002):

> The *Strickland* standard sets forth a two-prong test for ineffective assistance of counsel: First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). To show prejudice, the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is the probability sufficient to

> undermine the confidence in the outcome. *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 695.

*Id.* at 411-12. Additionally, we note that the burden is on the movant to overcome a strong presumption that counsel's assistance was constitutionally sufficient or that under the circumstances, counsel's action "might have been considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

When the record fails either to prove or to refute a material issue of fact, a hearing is required. "The trial judge may not simply disbelieve factual allegations in the absence of evidence in the record refuting them." *Fraser v. Commonwealth*, 59 S.W.3d 448, 452 (Ky. 2001). "The hearing ensures a defendant the protections of due process in securing his right to effective assistance of trial counsel. To that end, he is permitted to call witnesses and present evidence in support of his motion, to cross-examine the witnesses for the Commonwealth, and to be represented by counsel." *Knuckles v. Commonwealth*, 421 S.W.3d 399, 401 (Ky. App. 2014).

However, not every claim of ineffective assistance merits an evidentiary hearing. *Stanford v. Commonwealth*, 854 S.W.2d 742, 743 (Ky. 1993). The law on this issue is clear: the circuit court need only conduct an evidentiary hearing if (i) the movant establishes that the error, if true, entitles him or her to relief under RCr 11.42; and (ii) the motion raises an issue of fact that "cannot be determined on the face of the record." *Parrish v. Commonwealth*, 272 S.W.3d

-10-

161, 166 (Ky. 2008). "[A]n evidentiary hearing is not required when the record refutes the claim of error or when the allegations, even if true, would not be sufficient to invalidate the conviction." *Cawl v. Commonwealth*, 423 S.W.3d 214, 218 (Ky. 2014).

First, Robinson argues her defense counsel were ineffective when they did not elicit evidence of the victim's unfilled prescription that was still in his pocket at the time of the murder. Although the unfilled prescription itself was not produced at trial, defense counsel elicited testimony regarding the unfilled prescription during Deputy Bryant's examination and Hanna Hunsucker's cross examination. For example, during Deputy Byrant's cross-examination, the following exchange took place:

> Defense Counsel: The prescription that was found when [Bullock] went down to the Georgia Pain management clinic, it was an unfilled prescription?
>
> Deputy Bryant: Yes, sir.
>
> Defense Counsel: It hadn't been—He hadn't got his pills on that, on that [] night?
>
> Deputy Bryant: He had not.

A review of the record plainly indicates that defense counsel did elicit testimony that Bullock had not filled his prescription. While counsel may not have sought to introduce the actual paper prescription, the information was made available to the jury from a police officer. Therefore, we cannot agree with

Robinson that defense counsel were ineffective in failing to put forth testimony and/or evidence tending to show that it would have been futile for Robinson to go through the with robbery where she knew Bullock did not have any pills on him.

For her second issue, Robinson argues defense counsel should have requested a renunciation instruction. However, an examination of the record reveals Robinson's defense counsel did request a renunciation instruction and argued for some time to include such an instruction. Again, this argument is refuted by the record and is devoid of merit.

In her third issue on appeal, Robinson alleges on the morning after the crime, she reported the shooting death to her probation officer. Two days later, she reported the crime to law enforcement. Robinson contends she told her attorneys that she reported the crime to her probation officer, but they neither investigated nor presented testimony from him at trial.[4]

The jury was made aware of the fact Robinson reported Bullock's robbery and murder to police within three days of its occurrence. She argues, however, that her counsel should have called her probation officer to testify that she reported the crimes to him before even reporting them to law enforcement. She claims this testimony would have shown the jury "she was surprised and upset

---

[4] We would note that defense counsel did elicit during the penalty phase that she had reported the incident to her probation officer.

by what she had witnessed soon after it occurred." We can not agree that any error in this regard prejudiced Robinson, especially where the jury was made aware Robinson reported the crime within three days. Moreover, Robison's counsel were already tasked with explaining her inconsistent statements to police. Calling the probation officer would have added another version of the events further discrediting Robinson.

For her fourth issue, Robinson claims defense counsel failed to effectively investigate and cross-examine her co-defendants about their respective plea agreements in exchange for their testimony. Robinson does not argue what further investigation and cross-examination defense counsel would have done that would have been favorable to her defense. Likewise, she has not shown what prejudice she suffered. Moreover, defense counsel did introduce evidence suggesting that these witnesses were motivated to fabricate their testimony because they were angry at Robinson for reporting the crimes to the police.

Next, Robinson argues that her attorneys were ineffective because they opened the door to the introduction of improper character evidence, in the form of an alleged prior theft. In Robison's direct appeal, the Kentucky Supreme Court held that defense counsel had not opened the door, and therefore, the Commonwealth should not have been permitted to question the witness about the theft. *Robinson*, 2015 WL 5634398, at *8 ("This evidence clearly exceeded the

-13-

permissible scope of cross-examination under KRE 405(b), was prohibited by KRE 404(b), and should have been excluded."). In other words, the Court held that defense counsel had not opened the door, and the circuit court should not have allowed the testimony. Ultimately, however, the Court determined that this line of questioning by the Commonwealth amounted to harmless error.

> But because this Court can say with fair assurance that the erroneous admission of the evidence of the alleged Mercer County theft did not substantially sway the jury's decision, it is harmless. *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009). The reference to Robinson's prior alleged theft was fleeting, and the evidence of her guilt was substantial. It is unlikely that the evidence of the theft played any role in the jury's decision-making, much less a substantial one.

*Id.*

We cannot find ineffectiveness where the Supreme Court has already held that counsel did not open the door in the first instance. Moreover, the Court's harmless error analysis plainly demonstrates that introduction of this evidence did not materially prejudice Robinson.

### b. Recanted Testimony

Robinson's last issue is not based on her counsel's performance; it relates to what she believes her co-defendants would testify about her involvement in a new trial. Robinson argues that her co-defendants (Gary Lee Kirby, Bobby Peters, Josh Cameron, and Hanna Hunsucker) are prepared to testify that Robinson

-14-

did not participate in the robbery or murder, attempted to dissuade them from robbing Bullock, had no idea that they planned to shoot Bullock and that they testified against her previously out of anger.[5] She believes this "new evidence" entitles her to a new trial.

"[I]n order for newly discovered evidence to support a motion for new trial it must be 'of such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted.'" *Foley v. Commonwealth*, 425 S.W.3d 880, 886 (Ky. 2014) (quoting *Jennings v. Commonwealth*, 380 S.W.2d 284, 285-86 (Ky. 1964)).

Our Courts have historically viewed recanted testimony with skepticism.

> [T]here are special rules for situations of recanted testimony. The general rules are that recanting testimony is viewed with suspicion; mere recantation of testimony does not alone require the granting of a new trial; only in extraordinary and unusual circumstances will a new trial be granted because of recanting statements; such statements will form the basis for a new trial only when the court is satisfied of their truth; the trial judge is in the best position to make the determination because he has observed the witnesses and can often discern and assay the incidents, the influences and the motives that prompted the recantation; and his rejection of the recanting testimony will not lightly be set aside by an appellate court.

---

[5] We would note Gary Lee Kirby did not testify at trial and has no testimony to recant.

-15-

*Thacker v. Commonwealth*, 453 S.W.2d 566, 568 (Ky. 1970).

In the case before us, Robinson submitted a single paragraph stating what she believes co-defendants *would* testify to, arguing this on its face justified granting of the motion, or alternatively an evidentiary hearing. "[I]t is not enough merely to show that a prosecuting witness has subsequently made contradictory statements or that he is willing to swear that his testimony upon the trial was false, for his later oath is no more binding than his former one." *Anderson v. Buchanan*, 292 Ky. 810, 168 S.W.2d 48, 53-54 (1943). Robinson does not explain how she knows the witnesses will testify differently, when she came to acquire this knowledge or why they have suddenly decided to come forward on her behalf. Robinson's mere belief that the witnesses will testify in her favor now is not enough to warrant either a hearing or a new trial. This claim was appropriately rejected by the circuit court.

## IV. CONCLUSION

We affirm the judgment of the Rockcastle Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:          BRIEF FOR APPELLEE:

Michael L. Goodwin           Daniel Cameron
Louisville, Kentucky         Attorney General of Kentucky

                             Christopher Henry
                             Assistant Attorney General
                             Frankfort, Kentucky