Rachel JONES, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2009–SC–000375–DG.

Supreme Court of Kentucky.

Jan. 20, 2011.

Kathleen Kallaher Schmidt, Appeals Branch Manager, Department of Public Advocacy, Frankfort, KY, Counsel for appellant.

Jack Conway, Attorney General, Michael John Marsch, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for appellee.

Opinion of the Court by Justice CUNNINGHAM.

Appellant, Rachel Jones, was convicted in Laurel Circuit Court of multiple felony drug trafficking offenses for both controlled substances and marijuana. Her appeal centers on the claim that some of the drugs were not chemically tested, making the evidence of the controlled substance offenses insufficient for a conviction. She also claims error in the admission of evidence revealing other illegal drug transactions. Based upon the following, we affirm the decision by the Court of Appeals.

## I. Background

Appellant's convictions arose from a pair of controlled buys by Stanley Howard, an informant, under the direction of Detective Brian Lewis. Howard had informed Detective Lewis of his previous drug purchases from Appellant.

The first controlled buy was on January 22, 2007. With the detective waiting in a car, Howard purchased marijuana and fifteen purported alprazolam (Xanax) pills from Appellant. Two months later, on March 19, Howard and the detective arranged a second buy. This time Howard purchased three clonazepam (Klonopin) pills and another purported alprazolam pill.

After the pills were secured by police, they were turned over to the Kentucky State Police Crime Lab for identification. Three pills were confirmed through chemical testing to be clonazepam, a Schedule IV narcotic. The other pills were identified visually by two lab technicians using the pharmaceutical database Identidex. Based on their physical appearance, the pills were identified as alprazolam, also a Schedule IV narcotic. No chemical testing was performed to verify this identification.

Based on these two transactions, Appellant was charged with three counts of trafficking: one for the marijuana in the first buy; one for the alprazolam in the first buy; and one for the alprazolam and clonazepam in the second buy.[1] Appellant was convicted of trafficking in marijuana and two counts of third-degree trafficking in a controlled substance, second offense. She was sentenced to five years on each count, to be served consecutively, for a combined fifteen-year sentence.

Upon Appellant's matter of right appeal to the Kentucky Court of Appeals, the convictions were affirmed. This Court granted review to determine whether a conviction for trafficking in a controlled substance may be sustained, absent chemical testing.

## II. Analysis

### A. Chemical Testing

The crux of Appellant's argument is that chemical testing is necessary to prove that

---

1. The alprazolam and clonazepam purchased during the second buy constituted only one transaction because they are both Schedule IV narcotics. *See Commonwealth v. Grubb,* 862 S.W.2d 883 (Ky.1993).

a substance, such as a pill, is actually a controlled substance. Without such testing, Appellant urges, she cannot be convicted of trafficking in a controlled substance because the evidence of guilt is insufficient. Based on this theory, Appellant maintains that she was entitled to a directed verdict on the "alprazolam only" charge because there was no chemical evidence that the substance Appellant sold to Howard was actually alprazolam and not, for example, a simulated substance. Likewise, Appellant maintains that she was effectively denied a unanimous verdict on the "alprazolam and/or clonazepam" charge because one of the two theories of guilt (trafficking in alprazolam) was unsupported by sufficient evidence. *See, e.g., Commonwealth v. Whitmore,* 92 S.W.3d 76, 80–81 (Ky.2002).

■ The proper standard of review on a motion for directed verdict is stated in *Commonwealth v. Benham,* 816 S.W.2d 186 (Ky.1991) as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Id.* at 187–88 (internal citations omitted).

■ We note at the outset that Appellant failed to specify the grounds in her generic motion for a directed verdict. Such is required by CR 50.01, and this rule applies to criminal cases. *Potts v. Commonwealth,* 172 S.W.3d 345 (Ky.2005). "We have previously applied CR 50.01 to criminal cases and have held that its requirement of 'specific grounds' must be followed to preserve for appellate review a denial of a motion for a directed verdict of acquittal." *Id.* at 348. *See also Pate v. Commonwealth,* 134 S.W.3d 593, 597–98 (Ky.2004); *Daniel v. Commonwealth,* 905 S.W.2d 76, 79 (Ky.1995); *Hicks v. Commonwealth,* 805 S.W.2d 144, 148 (Ky.App. 1990). Here, Appellant merely stated that the evidence was insufficient to sustain a conviction. Appellant's motion made no mention of a lack of chemical analysis.

■ Despite this procedural deficiency, we conclude that Appellant's argument must still fail. Prior Kentucky case law has made clear that chemical testing of an alleged controlled substance is not required to sustain a conviction. In *Miller v. Commonwealth,* 512 S.W.2d 941 (Ky. 1974), a witness for the Commonwealth had observed the defendant prepare and inject a drug into his body. The witness identified the drug as methylene-dioxy-amphetamine, or "MDA," based on her own familiarity with MDA and the defendant's reaction to the drug. In response, the defendant noted the testimony of a state police narcotics officer who claimed that MDA could not be identified outside a laboratory. Based on this testimony, the defendant argued that the physical identification of the drug was insufficient to sustain his conviction because the drug had not been analyzed in a laboratory. *Id.* at 943. The Court held that, notwithstanding the officer's testimony, the jury was free to believe the Commonwealth's witness due to her familiarity with the drug, and also because she was on the

same footing as the officer who had not been qualified as an expert. *Id.* The Court reasoned that "[t]o hold otherwise and demand laboratory analysis would defeat the purpose of the statute and allow traffic or transfer of controlled substances to flourish in the secret confines of society." *Id.*

Additionally, in *Howard v. Commonwealth*, 787 S.W.2d 264 (Ky.App.1989), the alleged controlled substance, marijuana, was not even in existence at the time of trial nor introduced into evidence. Everyone just said it was marijuana. The Court of Appeals stated: "Although it would certainly have been desirable for the Commonwealth to have produced a sample of the marijuana ... we do not believe it to be essential because proof of the nature of the substance can be had by circumstantial evidence. In the case before us appellant offered to sell the substance he had with him as marijuana. It is, therefore, evident he thought it was marijuana." *Id.* at 267.

This state does not stand alone in this regard. To the contrary, courts around the nation have uniformly held that circumstantial evidence is enough to sustain a conviction for an offense involving a controlled substance. *See* 28A C.J.S. *Drugs and Narcotics* § 406. The reason for this is straightforward.

As the Sixth Circuit Court of Appeals noted:

Illegal drugs will often be unavailable for scientific analysis because their nature is to be consumed. As a practical matter, therefore, the evidentiary rule urged by Schrock would insulate from prosecution a large class of unlawful acts involving illicit drugs when the government happens upon the scene too late to seize a sample of the substance. *To our knowledge, no court has held that scientific identification of a substance is an absolute prerequisite to conviction for a drug-related offense, and we too are un-willing to announce such a rule.* In view of the limitations that such a burden would place on prosecutors, and in accordance with general evidentiary principles, courts have held that the government may establish the identity of a drug through cumulative circumstantial evidence.

*United States v. Schrock*, 855 F.2d 327, 334 (6th Cir.1988) (emphasis added).

In order to determine if. a substance—whether in the possession of police or not—is an illicit drug, both federal and state courts have, almost uniformly, adopted the following test:

[L]ay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction. Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence.

*United States v. Dolan*, 544 F.2d 1219, 1221–22 (4th Cir.1976) (citations omitted) (LSD-pill form). *See also United States v. Quesada*, 512 F.2d 1043, 1045 (5th Cir. 1975) (heroin); *United States v. Lawson*, 507 F.2d 433, 438–39 (7th Cir.1974) (cocaine) (overruled on other grounds by *United States v. Hollinger*, 553 F.2d 535 (7th Cir.1977)); *United States v. Jones*,

480 F.2d 954, 960 n. 4 (5th Cir.1973) (marijuana); *United States v. Atkins*, 473 F.2d 308, 314 (8th Cir.1973) (heroin); *United States v. Fantuzzi*, 463 F.2d 683, 689 n. 7 (2d Cir.1972) (cocaine); *United States v. Fiotto*, 454 F.2d 252, 254 (2d Cir.1972) (heroin); *United States v. Agueci*, 310 F.2d 817, 828 (2d Cir.1962) (heroin); *Toliver v. United States*, 224 F.2d 742, 745 (9th Cir.1955) (heroin).

This view is not limited to the federal courts. State courts throughout this country have reached the same conclusion. *See, e.g., Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind.2001) (toluene); *Campbell v. State*, 974 A.2d 156, 164–69 (Del.2009) (methamphetamine); *State v. Hernandez*, 85 Wash.App. 672, 935 P.2d 623, 627–28 (1997) (cocaine); *People v. Schroeder*, 264 Cal.App.2d 217, 227, 70 Cal.Rptr. 491 (Cal. Ct.App.1968) (morphine sulfate-pill form); *State v. Dunn*, 155 Mont. 319, 472 P.2d 288, 297–98 (1970) (LSD-pill form); *State v. Pipkin*, 101 N.J.Super. 598, 245 A.2d 72, 74–75 (App.Div.1968) (heroin); *Miller v. State*, 168 Tex.Crim. 570, 330 S.W.2d 466, 468 (1959) (marijuana).

Importantly, for this case, we note that virtually every state has enacted a simulated-substances statute like that enshrined in KRS 218A.350. By 1991, all but two states had adopted provisions addressing "imitation controlled substances." U.S. Department of Justice, *A Guide to State Controlled Substances Acts 21* (1991). *See also* Phoebe Carter, *Validity, Construction, and Effect of State Statute Regulating Sale of Counterfeit or Imitation Controlled Substances*, 84 A.L.R.4th 936 (1991). Thus, even with the adoption of these statutes by states across the country, courts still almost uniformly allow the introduction of circumstantial evidence in the absence of chemical testing to identify alleged controlled substances.

Undoubtedly, there will be instances where insufficient circumstantial evidence will cause the absence of testing to be fatal to the prosecution's case. This is not the situation here. In this case, most of the *Dolan* factors are present. The informant, Stanley Howard, is a reformed drug abuser working with the Task Force. He knows illegal drugs when he sees them and has purchased illicit drugs many times. *See United States v. Paiva*, 892 F.2d 148, 157 (1st Cir.1989) ("Although a drug user may not qualify as an expert, he or she may still be competent, based on past experience and personal knowledge and observation, to express an opinion as a lay witness that a particular substance perceived was cocaine or some other drug."). Howard knows the jargon and slang. He goes to Appellant's home on two separate occasions and—to everyone's understanding—buys alprazolam. In the first transaction, the informant paid for both alprazolam and marijuana. In the second transaction, he paid for both alprazolam and clonazepam. Obviously, both the seller and the buyer thought the drugs were, in fact, alprazolam. In addition, two chemists working with the Kentucky State Police Crime Lab confirmed the clonazepam and marijuana through chemical testing. The confirmation by chemical testing of two of the alleged illicit drugs lends support to the likelihood that the other was authentic. We have a witness highly experienced in dealing with drugs. The transactions involving the alprazolam were carried out with stealth and undercover operation. Both Appellant and the informant called the pills by the name of the illegal narcotic.

In addition to the *Dolan* factors, the alprazolam pills were visually identified. Two fully-qualified chemists who have each conducted thousands of examinations of substances like those at issue here related that, based upon the shape, color, and

markings, the drug visually appeared to be alprazolam. This was confirmed through a review on Identidex, a database only accessible to law enforcement agencies. Because of the lab's established protocol, the alprazolam was not chemically tested. The lab protocol authorized the use of the database as a means of identification of pills. As one federal court has noted, the trade dress of a pill is akin to looking at a human face.

It has been pointed out before that trade dress is a legal shorthand term for all the features that make it up. It is not color alone. It is not size and shape alone. It is not finish alone. It is all the features taken together. This is no different than the common experience that while human beings have two eyes, a nose and mouth, two ears, hair, and other facial features, the fact that two persons may have all of them of the same color in no way precludes identifying one as a different person than another. The nose and mouth may be of different sizes and shapes. So may the ears. The eyes may be prominent or sunken. The chin may be dimpled. And so on.

*American Home Products Corp. v. Chelsea Laboratories, Inc.*, 572 F.Supp. 278, 281 (D.C.N.J.1982). Thus, the manufacturers of these drugs use every tool in their arsenal, using different colors, specialized markings, different kinds of packaging in tablets or capsules or lozenges, and different shapes, in order to create a unique trade dress.

Further, a similar type of visual identification was found sufficient in *Sterling v. State*, 791 S.W.2d 274 (Tex.App.-Corpus Christi 1990). In that case, the defendant possessed what was believed to be twelve diazepam (valium) tablets at the time he encountered police. At a hearing, a pharmacist testified that the tablets were diazepam based on their appearance and markings, and that it was part of his profession to identify medication which the Texas Controlled Substances Act required to be dispensed by prescription. No chemical analysis of the tablets was introduced. The court found that the evidence was sufficient to support the trial court's finding, stating: "[a]person who is familiar with a substance may identify it. An expert may identify a controlled substance without chemical analysis." *Id.* at 277 (internal citations omitted). *See also State v. Stank*, 288 Wis.2d 414, 708 N.W.2d 43 (Wis.Ct.App.2005); *State v. Carter*, 981 So.2d 734 (La.Ct.App.2008).

Some deference should be given to the presumed integrity of this procedure of visual identification. At trial, the identity of the alprazolam was not brought into question, except indirectly by a generic directed verdict motion. We also note that Appellant never called into question the reliability of Identidex as a vehicle for identification of controlled substances. Testimony was given which indicated that the database used for the identification of the alprazolam is accessible only to law enforcement agencies. In other words, simulation would have been extremely difficult. Criminal defendants have free and open access to independent chemical testing of the evidence in drug cases. It is highly unlikely that a person will be wrongfully convicted of trafficking in a controlled substance as opposed to dealing in a simulated drug. Finally, as noted earlier, when Appellant moved for a directed verdict, she did not mention the absence of testing; nor did counsel for Appellant object to the testimony of either chemist or the introduction of their reports. This is a clear indication that the integrity of the alprazolam was not in doubt by anyone in the courtroom.

Our duty in considering a directed verdict on appeal is not whether the evidence would have persuaded us to return a guilty verdict. To the contrary, our role is strictly limited to determining if, under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt. *Benham,* 816 S.W.2d at 187–88. Based upon the evidence presented at trial, and drawing all fair and reasonable inferences from the evidence in favor of the Commonwealth, we believe that there is sufficient circumstantial evidence to support the jury's verdict. It was not "clearly unreasonable for a jury to find guilt." Therefore, the trial court did not err in denying Appellant's motion for directed verdict.

Similarly, as there was sufficient evidence as to both the alprazolam and clonazepam charges, no unanimity violation occurred. *See Wells v. Commonwealth,* 561 S.W.2d 85 (Ky.1978).

### B. Other Acts

■ Appellant also complains that other instances of her drug dealings were discussed in the video of the controlled buys played for the jury. Specifically, she now objects to statements in the conversations between Howard and Detective Lewis and between Howard and Appellant. Appellant did not object to this footage at trial, thus failing to preserve this issue for appeal. She nonetheless requests review for palpable error. RCr 10.26.

■ Instead of delving into an unnecessary KRE 404(b) analysis of whether this video footage was admissible or should have been redacted, this Court simply notes that any possible error in this regard was not of a palpable nature. To be palpable, an error must result in manifest injustice, either through the "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Common-*

*wealth,* 207 S.W.3d 1, 3 (Ky.2006). This alleged error has no grounding in constitutional law, but merely pertains to an evidentiary policy, thereby clearly failing the latter form of palpable error. Nor can we say that there is any real probability that the brief discussion on video of Appellant's other drug dealing activity caused a different result at trial. Compared to the direct video recording of Appellant trafficking in drugs on two different occasions two months apart, the possible additional implication that Appellant had a disposition to deal drugs contained minimal value and prejudice. Even if this "other acts" evidence was inappropriately admitted, it did not constitute palpable error.

### III. Conclusion

For the aforementioned reasons, the decision of the Court of Appeals is hereby affirmed.

MINTON, C.J.; ABRAMSON, SCOTT and VENTERS, JJ., concur. NOBLE, J., dissents by separate opinion in which SCHRODER, J., joins.

NOBLE, J., Dissenting:

Respectfully, I dissent.

Relying on case law that is thirty to forty years old, and the fact that seven other states have agreed with their position, the majority holds that a "look-see," or visual identification of an alleged drug is sufficient in the scientific world of today to say that the pills in question here had the chemical signature of alprazolam. Chemistry being what it is, that view seems to me comparable to saying any white powder is cocaine—not good science. This view harkens back to a time when drug abuse was just beginning to be the problem that it is today, and little was known about trafficking in look-alike drugs, or how easy it is to counterfeit a common

drug. In an effort to save a conviction, the majority sets a precedent that is unwarranted and will lead to felony convictions which should rightfully be misdemeanors.

In the only other case from this Court dealing with this issue, *Miller v. Commonwealth,* 512 S.W.2d 941 (Ky.1974), a witness for the Commonwealth had observed the defendant prepare and inject a drug into his body and identified it as methylene-dioxy-amphetamine or "MDA" based on her own familiarity with that drug and how the defendant reacted to the drug. In response, the defendant noted the testimony of a state police narcotics officer, who claimed that MDA could not be identified outside a laboratory. Based on this testimony, the defendant argued that the physical identification of the drug was insufficient to sustain his conviction because the drug had not been analyzed in a laboratory. *Id.* at 943. The Court held that notwithstanding the officer's testimony, the jury was free to believe the Commonwealth's witness due to her familiarity with the drug and because she was on the same footing as the officer, who had not been qualified as an expert. *Id.* The Court reasoned that "[t]o hold otherwise and demand laboratory analysis would defeat the purpose of the statute and allow traffic or transfer of controlled substances to flourish in the secret confines of society." *Id.*

In light of current laboratory usage to identify chemical substances and the subsequent enactment of a statute making trafficking in a simulated substance a crime, *Miller* appears to be somewhat a product of the times, though it is consistent with federal authority allowing proof of identity of a substance, which will be discussed later in this dissent. However, ironically, in this case laboratory chemical analysis *was* done on the other substance sent to the lab, but not on the "alprazolam." Can any chemical signature be detected by the naked eye?

Also, in *Miller,* the witness had observed the effect of the drug on the person to whom the defendant gave the drug, and she had personal familiarity with the drug. *Id.* at 942–43. Thus, her identification resulted from a combination of the basic physical appearance of the drug, her personal experience with that type of drug, and the physical effects she observed, whereas the lab technicians in this case identified the pills solely through a comparison of the physical appearance of the pills against a drug identification database. Here the pills were identified as a controlled substance based only on a visual identification. Additional facts brought out in testimony that Appellant *thought* the pills were Xanax, the brand name of alprazolam, and that the technician had never personally seen simulated Xanax do nothing to establish that the pills were in fact Xanax.

*Miller,* decided in 1974, precedes the enactment of the simulated substances statute, KRS 218A.350, by eight years. That statute was specifically drafted in recognition of the fact that the drug-trafficking culture did not always deal in actual controlled substances, and to prevent the defense that the substance trafficked was not the drug charged. The statute is generally directed against drug trafficking, and despite not involving an actual controlled substance, does not violate due process. *See Buford v. Commonwealth,* 942 S.W.2d 909, 911–12 (Ky.App.1997). However, by its very definition, it is not a lesser-included offense to trafficking in a controlled substance. This statute requires that the trafficking be in a substance other than a controlled substance for the offense to apply. There is also a significant difference in penalties. Trafficking in a controlled substance is a Class

B felony, and trafficking in a simulated substance is a Class A misdemeanor.

Of course, Appellant was free to challenge the testimony of the Commonwealth's experts. Indeed, she did by cross-examining the lab technicians on the possible existence of simulated alprazolam pills, which was admitted, though the technician further testified that she had never seen any. Appellant could also have called into question the reliability of Identidex as a vehicle for identification, through cross-examination, a hearsay challenge, or otherwise. She also could have challenged the technicians' qualifications as experts. Additionally, she could have tried to call her own expert to attest to the alleged unreliability of physical identification or the misidentification of the pills. These efforts would have clarified the problems of a sight-only identification of the alprazolam. Her failure to ask these questions, however, does not change the fact that the *burden is on the Commonwealth* to prove that the drug was a controlled substance.

It is a baseline fact that if such a purported drug is not actually a controlled substance, then it is a simulated controlled substance. This pivotal fact appears necessary for the Commonwealth to know how to charge in the case, since trafficking in a simulated substance is not a lesser-included offense of trafficking in a controlled substance. To prove trafficking in a controlled substance, the question then is what is necessary to positively identify a chemical substance as controlled? The statutes which establish the schedule of drugs and thus determine what is a "controlled substance" are instructive. KRS 218A.050 and KRS 218A.070 list which drugs are considered to be Schedule I or Schedule II controlled substances. Each lists "[a]ny material, compound, mixture or preparation that contains any quantity of the following" and proceeds to list *chemicals* that must be present before a substance fits in that schedule. The list reads like a chemist's final exam.[2] Without

---

**2.** · For example, KRS 218A.050 lists the following chemicals:

> Any material, compound, mixture, or preparation which contains any quantity of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, unless specifically excepted, whenever the existence of these isomers, esters, ethers, or salts is possible within the specific chemical designation: Acetylmethadol; Allylprodine; Alphacetylmethadol; Alphameprodine; Alphamethadol; Benzethidine; Betacetylmethadol; Betameprodine; Betamethadol; Betaprodine; Clonitazene; Dextromoramide; Dextrorphan; Diampromide; Die thylthiambutene; Dimenoxadol; Dimepheptanol; Dimethylthiambutene; Dioxaphetyl butyrate; Dipipanone; Ethylmethylthiambutene; Etonitazene; Etoxeridine; Furethidine; Hydroxypethidine; Ketobemidone; Levomoramide; Levophenacylmorphan; Morpheridine; Noracymethadol; Norlevorphanol; Normethadone; Norpipanone; Phenadoxone; Phenampromide; Phenomorphan; Phenoperidine; Piritram-

> ide; Proheptazine; Properidine; Propiram; Racemoramide; Trimeperidine.
>
> . . . Acetorphine; Acetyldihydrocodeine; Benzylmorphine; Codeine methylbromide; Codeine–N–Oxide; Cyprenorphine; Desomorphine; Dihydromorphine; Etorphine; Heroin; Hydromorphinol; Methyldesorphine; Methyldihydromorphine; Morphine methylbromide; Morphine methylsulfonate; Morphine–N–Oxide; Myrophine; Nicocodeine; Nicomorphine; Normorphine; Pholcodine; Thebacon.
>
> . . . 3, 4–methylenedioxyamphetamine; 5–methoxy–3, 4–methylenedioxy amphetamine; 3, 4, 5–trimethoxyamphetamine; Bufotenine; Die thyltryptamine; Dimethyltryptamine; 4–methyl–2, 5–dimethoxyamphetamine; Ibogaine; Lysergic acid die thylamide; Marijuana; Mescaline; Peyote; N–ethyl–3–piperidyl benzilate; N–methyl–3–piperidyl benzilate; Psilocybin; Psilocyn; Tetrahydrocannabinols; Hashish; Phencyclidine, 2 Methylamino–1–phenylpropan–1–one (including but not limited to Methcathinone, Cat, and Ephedrone); synthetic cannabinoid agonists or piperazines; salvia.

chemical testing or observing the effect of the drug after ingestion, any "identification" is mere guesswork, and such testimony should not be allowed. Additionally, these statutes, though first enacted in the 1970s when widespread drug abuse and trafficking hit our nation, have been amended six times, most recently in 2005. The legislature has clearly kept apace with the changing drug scene and chemical analyses, and it is a miscarriage of justice for the Court to fail to do so.

Indeed, it can be argued that it is not testimony about Xanax, or even alprazolam that is required, but rather *which* of the chemicals in a controlled substance listed in the schedules was contained in the drug.

Since it is the *chemical signature* of a substance that identifies it as belonging to a particular controlled substance category or schedule, that signature must be identified sufficiently for a jury to find beyond a reasonable doubt that the substance (drug) is what it is purported to be. It would appear obvious that a chemical signature cannot be identified to a reasonable level by looking at the substance or because someone *thinks* that is what the substance is. That would be permitting a *subjective belief* rather than objective proof.

While it is true that an argument can be made that the identity of the drug in this case could be established by circumstantial evidence if that evidence was sufficient to convince a reasonable jury beyond a reasonable doubt that the substance was alprazolam, a significant level of proof would be required and would have to include some evidence that at some point the evidence in question was *positively known to be the drug*. In *United States v. Scott,* 725 F.2d 43 (4th Cir.1984), the Fourth Circuit enumerated several circumstantial factors that, when combined, could prove the identity of a substance, including knowing that the substance produced the expected effects when ingested and that it was used in the same manner as the illicit substance would be used, similar to the holding in *Miller.* However, as the Sixth Circuit later expressed in a case following *Scott,* that circumstantial proof must be substantial and competent, and based on the record as a whole. *United States v. Wright,* 16 F.3d 1429 (6th Cir.1994). The proof in *Wright* included that two government witnesses had personally used some of the drugs in question which were not available for testing.

That level of proof does not exist here. No one testified that any of the substance had been ingested or that anyone was observed after taking it. The effect of the chemical reaction which is at the heart of making a substance controlled was not tested. In short, there was no objective evidence that could establish that the substance was in fact alprazolam rather than a simulated substance.

And further, as a matter of policy, there is no reason to resort to circumstantial evidence when a simple chemical analysis can remove all question. In fact, the other drugs in the Appellant's possession were chemically tested, and the opportunity surely existed for chemical testing of the purported alprazolam. Given that Kentucky law recognizes two ways to commit drug offenses—through a controlled substance or through a simulated controlled substance—there is a need for objective identification so that prosecutors can make the appropriate charge. Additionally, for evidence to be substantial and competent, it must be based on more than a subjective belief. And while I do not hold that a substance may *never* be identified by circumstantial evidence, that situation should

... gamma hydroxybutyric acid.

KRS 218.050(1)-(4).

be rare and is best limited to cases where the substance is no longer available for chemical testing. Obviously, the proof will still have to be competent and substantial, and sufficient to objectively identify the drug.

Here, the most compelling evidence is that the Appellant thought she was selling Xanax, and the technicians thought it looked like Xanax and had never seen any simulated Xanax. There is not even a scintilla of proof that the substance actually was Xanax, let alone competent and substantial proof. Because the Commonwealth failed to prove an essential element of its case, the Appellant was entitled to a directed verdict on the trafficking in alprazolam charges. I would reverse and require proof commensurate with sound chemical testing, easily obtainable in today's scientific world, and which would be sound policy.

SCHRODER, J., joins this dissenting opinion.