# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: DECEMBER 17, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0285-MR

JAMES DOUGLAS YOUNG                 APPELLANT

ON APPEAL FROM WARREN CIRCUIT COURT
HONORABLE STEVE ALAN WILSON, JUDGE
V.                 NO.  18-CR-00479-001

COMMONWEALTH OF KENTUCKY           APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**REVERSING AND REMANDING**

A circuit court jury convicted James Douglas Young on nine counts of trafficking various illicit drugs and controlled substances, one count of receiving stolen property, and one count of possession of drug paraphernalia. Young was sentenced to twenty years' imprisonment.  He appeals from the resulting judgment as a matter of right.[1]

Young asserts three claims of reversible error: (1) the trial court erroneously denied him the right to participate in his case as "hybrid counsel," (2) the Commonwealth failed timely to disclose exculpatory information in

---

[1] Ky. Const. § 110(2)(b).

violation of the *Brady* Rule,[2] and (3) the trial court failed to direct a verdict of acquittal on several counts of drug possession with intent to distribute.

Because, as the Commonwealth concedes, the trial court committed structural error as to the first claim of error, we reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion. We analyze Young's remaining claims of error as they may arise in the event of a retrial. We find no error in the remaining claims.

## I. FACTUAL BACKGROUND

While working as a confidential informant for the local drug task force, Tyler Poole suggested Young to a detective and showed him the apartment where Young lived. The task force then investigated Young for trafficking drugs out of his apartment. The detective set Poole up to perform a controlled buy. He put a wire on Poole, gave him $390 in marked bills, and directed him to Young's apartment. Poole engaged with Young at his apartment, negotiated a deal for a quantity of methamphetamine, then returned to the detective with $90 and 4.487 grams of methamphetamine. Poole also reported that while he did not see the drugs himself Young told him he was also selling heroin, Adderall, and Oxycontin.

The detective obtained a warrant to search Young's apartment. The search produced twelve baggies of methamphetamine, five baggies of

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring prosecutors to disclose to the defense materially exculpatory evidence in the government's possession).

heroin-Fentanyl mixture, one baggie of cocaine, Suboxone strips, Adderall in 20 mg and 30 mg doses, Oxycodone, and seventeen baggies of marijuana, along with $674 in Young's wallet and $250 of marked money from the controlled buy.

The grand jury returned a fourteen-count indictment against Young, including multiple counts for trafficking in a controlled substance, trafficking in marijuana, receiving a stolen firearm, and possession of drug paraphernalia. Following a three-day trial, the jury convicted Young on the twelve counts presented to it.

## II. ANALYSIS

### A. The trial court committed structural error when it refused to hold a *Faretta* hearing upon Young's request for hybrid representation, requiring reversal.

Approximately forty days before trial, Young sent a letter to the trial court expressing not only his displeasure with his counsel's performance but also his desire to call and cross-examine witnesses himself. Ten days before trial, Young sent a similar letter that was received the day of trial. After the jury was selected, Young again asserted his desire to cross-examine certain witnesses himself. The trial court nonetheless denied the request for a hearing and denied Young the option to proceed unrepresented, even for the limited purpose of cross-examining witnesses. The trial court stated that the law did not recognize the right to hybrid counsel and that Young would either proceed completely pro se or Young would exercise his right to present his defense, including the right to cross-examine witnesses, solely through counsel.

3

Whether the trial court erred as a matter of law on this point is a legal question we review de novo.

Young first asserts a right to "hybrid counsel" under both the United States and Kentucky Constitutions. He follows this assertion by arguing the trial court committed reversible error when it refused to hold a *Faretta* hearing and when it told him that Kentucky did not recognize a right to hybrid counsel, effectively forcing Young to accept his counsel and his counsel's decision-making. The Commonwealth concedes that under Kentucky precedent the trial court committed reversible error. We agree with both parties that the trial court committed reversible error on this point alone, despite a clear lack of prejudice.

Of course, criminal defendants have a right to competent legal representation in criminal proceedings under the Sixth Amendment of the United States Constitution[3] and under Section 11 of the Kentucky Constitution.[4] But criminal defendants also have the right to proceed unrepresented if they properly waive their right to counsel and are guaranteed procedural safeguards in that process.[5] The primary safeguard is a *Faretta* hearing, which is mandated whenever a defendant timely and unequivocally[6]

---

[3] *Gideon v. Wainwright*, 372 U.S. 335 (1963).

[4] Ky. Const. § 11 guarantees a criminal defendant the right "to be heard by himself and counsel." *Deno v. Commonwealth*, 177 S.W.3d 753, 757 (Ky. 2005); *Jenkins v. Commonwealth*, 491 S.W.2d 636, 638 (Ky. 1973).

[5] *Faretta v. California*, 422 U.S. 806, 817 (1975) ("We confront here a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so."). *See Deno*, at 758.

[6] *Deno*, at 758 (citing *Moore v. Commonwealth*, 634 S.W.2d 426, 430 (Ky. 1982)).

requests to proceed unrepresented to any extent.[7]  Under *Faretta,* to deny this hearing after a defendant properly requests it amounts to a violation of the federal constitution.

Further, criminal defendants can request and shall be afforded the option of what is sometimes called "hybrid counsel,"[8] which refers to a defendant's proceeding unrepresented as to chosen, pre-defined aspects of a trial or proceeding, while counsel's representation is confined to other aspects.[9] Though under a "hybrid counsel" arrangement a defendant's waiver of representation is confined only to specific parts of a trial or proceeding, the court still must hold a *Faretta* hearing.[10]  During the hearing, the court must find that the defendant voluntarily, knowingly, and intelligently waives his right to counsel to whatever permitted extent, and to predetermine the scope of the defendant's waiver and the remaining scope of duty of the defendant's counsel.[11]

---

[7] *See Grady v. Commonwealth,* 325 S.W.3d 333, 341 (Ky. 2010); *Major v. Commonwealth,* 275 S.W.3d 706, 718 (Ky. 2009) (citing *Wake v. Barker,* 514 S.W.2d 692, 697 (Ky. 1974)) ("[U]pon an unequivocal request to appear pro se or an unequivocal request to limit the role of appointed counsel, the trial court must conduct a hearing to determine that any such waiver is made knowingly and intelligently.").

[8] *Wake,* 514 S.W.2d at 696.

[9] *Deno,* at 757 (citing *Hill v. Commonwealth,* 125 S.W.3d 221, 225–26 (Ky. 2004), *overruled on other grounds by Grady,* 325 S.W.3d 333) ("The wording of Section 11 of the Kentucky Constitution, unlike that of the similar provision which appears in the United States Constitution, guarantees a criminal defendant the right: (1) to represent himself *pro se*; (2) to be represented by counsel; or (3) to have hybrid representation.").

[10] *See Grady,* at 342.

[11] *Id.*

The present case is factually similar to *Deno v. Commonwealth*.[12]  In that case, the defendant felt insecure about his counsel's commitment to his case, stating to the court that he felt like he had been lied to, ignored, and was generally concerned he would not receive a fair trial.[13]  After reviewing the extent of appointed counsel's services in the case, the trial court found counsel had prepared enough for the case.  The defendant's timely and unequivocal request to proceed partially unrepresented notwithstanding, the trial court failed to recognize the defendant's right to hybrid counsel and failed to conduct a *Faretta* hearing.[14]  The trial court told the defendant, "you can't go co-counsel. You either represent yourself or [your attorney] represents you."[15]  The defendant was later convicted of the charges against him and sentenced to twenty years in prison.

We reversed the trial court, recognizing the right to hybrid counsel under Section 11 of the Kentucky Constitution.[16]  We then found that the defendant's request for hybrid counsel was timely when it was made before meaningful trial proceedings had begun[17] and that it was unequivocal when the defendant

---

[12] 177 S.W.3d 753.

[13] *Id.* at 757.

[14] *Id.* at 758–59.

[15] *Id.*

[16] *See id.* at 758.

[17] *Id.* at 758 (citing *Baucom v. Commonwealth*, 134 S.W.3d 591 (Ky. 2004)) ("A request for hybrid representation is timely if made before meaningful trial proceedings have begun.").

specified the extent of the services he wished to waive.[18] Since the trial court incorrectly applied the law regarding the right to hybrid counsel and denied the defendant his ability properly to waive his right to full counsel, the trial court committed reversible error.[19]

Here, the trial court, as in *Deno,* was mistaken as a matter of law that Kentucky does not recognize hybrid counsel arrangements in criminal trials. And Young made a timely request, sent by letter forty days before trial.[20] The request was also unequivocal because Young specifically sought to call witnesses and to cross-examine them himself after his counsel refused to, although Young still wished that counsel would proceed with other aspects of the trial. This was a proposed hybrid representation. The trial court denied Young the opportunity, requiring him to choose either to proceed unrepresented for the whole trial or to proceed with counsel's total representation for the whole trial.[21]

---

[18] *Id.* ("A request for hybrid representation is unequivocal if the defendant specifies the extent of the services he desires.") (citing *Soto v. Commonwealth*, 139 S.W.3d 827, 857 (Ky. 2004)).

[19] *See id.* at 758–59.

[20] The *Deno* court briefly discusses these situations where a request is made later than what might be convenient or ideal. *See id.* at 758. Often, the request could have been made "earlier." But Deno's right to hybrid counsel was properly recognized as a fundamental one and should generally be preserved if possible where it is not made to delay or solely to impede the trial process, e.g., spontaneously, for the first time, during trial.

[21] *Nunn v. Commonwealth*, 461 S.W.3d 741, 748 (Ky. 2015) ("A trial court acts erroneously where it affirmatively misrepresents a defendant's choice of counsel as being between 'only two alternatives: either represent himself or accept appointed counsel.'").

While the trial court mistook the law on this matter, we note that it still has the discretion to assess Young's capacity to waive his rights in the first place and even to structure or modify the proposed hybrid arrangement depending on Young's perceived competency.[22]  But the availability of the right to present one's own defense, even if only in part, is a basic right that cannot be completely foreclosed under Section 11 of the Kentucky Constitution.

Finally, the trial court did not hold a *Faretta* hearing, so it could not have made a proper finding regarding Young's capacity to waive his right to counsel.[23]  Young was effectively denied the opportunity to waive his constitutional right to counsel and to proceed in his own defense.  This was a structural error requiring reversal, even absent a showing of resulting prejudice.  Accordingly, we are constrained to reverse the trial court and require on remand that the trial court make a hybrid arrangement available should Young again properly request it.  This we hold regardless of whether Young suffered actual prejudice at trial or whether his own advocacy will ultimately prove less effective on remand.

## B. The Commonwealth did not violate the *Brady* Rule.

Young next contends that the Commonwealth failed to make timely disclosures of exculpatory evidence to him as required under the *Brady* Rule. Young believes the undisclosed evidence could have been used to impeach Poole, the Commonwealth's confidential informant, particularly with Poole's

---

[22] *Major*, 275 S.W.3d 706, 721 (Ky. 2009).

[23] *Moore*, 634 S.W.2d at 430.

Michigan criminal record, his probation status, and a previous arrest for possession of counterfeit currency. Further, Young claims error in the Commonwealth's nondisclosure of the source of the money paid to Poole as the informant's compensation.

The Commonwealth asserts that *Brady* is only applicable to evidence discovered to have been in the Commonwealth's possession after trial. It also claims that it did not possess, much less suppress, any of the allegedly exculpatory evidence. The Commonwealth then argues that this issue is practically moot because it has confessed structural error on Young's first issue. In the event this issue arises on remand we address each item briefly.

In a pretrial motion, Young requested the disclosure of exculpatory information. The trial court granted the motion and reminded the Commonwealth of its disclosure obligations to Young. The Commonwealth was then ordered to turn over any exculpatory evidence no later than thirty days before trial.

The United States Supreme Court ruled in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[24] These are the components of a *Brady* violation: (1) the evidence at issue must have been favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State,

---

[24] 373 U.S. at 87.

whether willfully or inadvertently; and (3) prejudice must have ensued.[25] The prejudice element is satisfied if there is a "reasonable probability" the outcome of the trial would have been different had the evidence properly been turned over.[26] In other words, the suppression results in material prejudice if the resulting trial is so unfair that its outcome becomes unworthy of confidence.[27]

But this duty to disclose does not obligate the prosecution to detect and discover information it does not know or to thoroughly investigate and gather exculpatory information on the defendant's behalf.[28] There is no *Brady* violation when the defense could have obtained information without the consent or assistance of the Commonwealth.[29] And as the Commonwealth correctly points out, *Brady* applies only to "the discovery *after trial* of information that had been *known* to the prosecution but *unknown to the defense.*"[30]

Exculpatory evidence subject to disclosure includes information that could be used to impeach the Commonwealth's witnesses.[31] If the Commonwealth's delay gave it "a more favorable opportunity to convict," there

---

[25] *Commonwealth v. Bussell*, 226 S.W.3d 96, 99 (Ky. 2007) (citing *Brady*, at 87).

[26] *Id.*

[27] *See Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995).

[28] *See Bowling v. Commonwealth*, 80 S.W.3d 405, 410–411 (Ky. 2002).

[29] *See id.* at 410.

[30] *Id.* (citing *U.S. v. Agurs*, 427 U.S. 97, 103 (1976)) (emphasis in original).

[31] *Finnell v. Commonwealth*, 295 S.W.3d 829, 832 (Ky. 2009) (citing *Napue v. Illinois*, 360 U.S. 264, 270 (1959)).

10

is reversible error.[32] Such impeachment evidence includes evidence of bias, certain character evidence, or any other evidence that would "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."[33]

Each of these pieces of evidence we presume would have some exculpatory value under *Brady.* We also acknowledge the timeliness and effectiveness of Young's request for exculpatory information. Still, that only begins our analysis.

### 1.     *Poole's Michigan criminal history and probation status.*

Before trial, Young specifically requested disclosure of any evidence concerning the prior criminal convictions and probation or parole status of the Commonwealth's witnesses. This information was not given to Young with respect to Poole. Counsel for the Commonwealth admitted that she had not investigated Poole's criminal history or parole status before trial. But the Commonwealth also asserts that it has not been in possession of Poole's criminal history or probation status, so the Commonwealth's position seems to be that it did not "know," much less possess that information for purposes of *Brady.* This Court will also presume that criminal records and probation status are generally public record, accessible to Young on his own initiative.

We can accept that the Commonwealth apparently did not ever "know" Poole's criminal background. Even if it did know that Poole had a criminal

---

[32] *Id.* (citing and quoting *Epperson v. Commonwealth*, 809 S.W.2d 835, 840 (Ky. 1990)).

[33] *Olden v. Kentucky,* 488 U.S. 227, 231 (1988).

history, under *Bowling* there is no *Brady* violation where the information sought is public record or is otherwise accessible to the defendant.[34]  Even if the Commonwealth here knew of Poole's criminal record and probation status, and even if it had exculpatory value, no *Brady* violation occurred because Young could have accessed that information himself and can now do so on remand.

### 2.    *Poole's arrest for possession of counterfeit currency.*

Young also argues he demanded Poole's arrest record. In a hearing, Young stated that he "knew for a fact" that Poole had been arrested for possession of counterfeit currency.  Young argues that having more information about this at trial would have allowed him to demonstrate bias on the theory that Poole expected leniency on that charge for his cooperation.

While this information might have had exculpatory impeachment value, there was no *Brady* violation because Young was aware of the fact and could have discovered the information himself through public record.  Alternatively, Young could have probed Poole about the incident on cross-examination to demonstrate bias.  Because Young himself admits in his brief that he "knew" about the arrest, it was not "unknown" to the defense at the time of trial, and therefore no *Brady* violation occurred.[35]

---

[34] *See Bowling*, at 410.

[35] *See Finnell*, at 832.

### 3. *Information regarding the source of Poole's compensation from state sources.*

Young argues it was a *Brady* violation for the Commonwealth not to disclose the source of part of the funds the drug task force used to compensate Poole. Namely, when Poole returned from the controlled buy with $90, the detective handed him $10 more, giving Poole a total of $100 for his services as an informant. The detective apparently testified at trial generally that the money came from the Kentucky State Police "Drug Fund," but the Commonwealth allegedly furnished no other information about where the $10 came from or the general policies related to such KSP expenditures. Young argues that the nondisclosure of the source of that $10 and the policies related to drug-task-force expenditures violated *Brady* because such information could reveal nonconformity with law enforcement payment protocol and thereby undermine the detective's credibility on cross-examination. Young argues that this information was necessary for a "complete defense" and due process, and that Young was denied that defense and due process because he could not cross-examine about what he did not know: the source of Poole's compensation. And considering Young's specific request for information about the "consideration, money or other remuneration provided to any witness," he now argues that in hindsight he was deprived of a full defense when the Commonwealth did not turn over records related to Poole's compensation.

True, Young requested, at least in broad form, information related to Poole's compensation, and Young did not have that information by trial and probably could not have obtained it himself. But even if it is assumed that the

Commonwealth knew this information and withheld it, intentionally or not, the nondisclosure of this information is simply not materially prejudicial under *Brady.*

While law enforcement is rightfully held to the highest standard of procedure and conduct, and deviations from certain procedures may properly expose such state officials to scrutiny in cross-examination, the source of the $10 simply remains patently immaterial to Young's defense in this case. Even considering other noted defects in procedure, this would add very little, if anything to Young's defense. It did not deprive him of the "full" defense due process affords, even if it did make the detective "unavailable" for cross-examination on that narrow topic. Its absence does not remotely undermine our confidence in the outcome of the case. We find no reversible *Brady* violation in the Commonwealth's failure to disclose and detail the source of these funds.

## C. The trial court properly denied all of Young's motions for directed verdict.

Young asks this Court to reverse the trial court's denial of a directed verdict of acquittal, arguing he was entitled to a directed verdict on Counts 2, 3, 5, 6, 7, and 8.[36] In doing so, Young asserts that no reasonable juror could have found beyond a reasonable doubt that the substances in his possession were entirely what the Commonwealth asserted them to be because not all of the substances seized were chemically tested, nor could a reasonable juror

---

[36] Count 2 (Trafficking Methamphetamine), Count 3 (Trafficking Heroin), Count 5 (Trafficking Hydrocodone), Count 6 (Trafficking Oxycodone), Count 7 (Trafficking Adderall) and Count 8 (Trafficking Suboxone).

14

infer an intent to distribute the substances from his possession of the substances. We disagree and accordingly affirm the trial court's denial of a directed verdict of acquittal on all counts.

For our purposes, the charges can be divided into two separate groups: Group 1 (Counts 2 and 3, heroin and methamphetamine), which was chemically analyzed in part by Kentucky State Police Crime Lab technician Wendy Williams, and Group 2 (Counts 5, 6, 7, and 8, hydrocodone, oxycodone, Adderall, and suboxone), which was identified visually by a Warren County pharmacist, Darren Lacefield, at trial.

### 1. Standard of Review for Directed Verdict of Acquittal.

Our standard of review on a motion for directed verdict of acquittal is supplied by *Commonwealth v. Benham*:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[37]

---

[37] *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky. 1991).

In *Jones v. Commonwealth*,[38] the defendant appealed the denial of her motions for directed verdict of acquittal as to similar trafficking charges based on an asserted lack of chemical testing. We held that the Commonwealth can prove the identity of a substance without direct chemical analysis.[39] There are several ways and combinations of ways in which the identity of a substance can be proven beyond a reasonable doubt. Prosecutions for drug offenses may frequently and properly involve chemical analysis, especially where the substance is not prone to immediate visual identification.[40] But other identification methods and circumstances can be sufficient to support a guilty verdict, including the visual identification by expert pharmacists and lab technicians,[41] a drug user's testimony regarding the effects of the substance on himself or others following use,[42] the trade dress of the substance,[43] and the defendant's own statements about the substance's identity.[44] The thrust of

---

[38] 331 S.W.3d 249 (Ky. 2011).

[39] *Id.* at 256.

[40] This may be especially appropriate with powder substances that are not always subject to ready identification like commercial pharmaceuticals. *See id.*, at 256–57 (Noble, J., dissenting) ("Chemistry being what it is, [the view that visual identification is sufficient] is comparable to saying any white powder is cocaine-not good science. This view harkens back to a time when . . . little was known about trafficking in look-alike drugs, or how easy it is to counterfeit a common drug.").

[41] *E.g.*, *see id.* (two trained chemists working as lab technicians identified alprazolam using a pharmaceutical database, "Identidex," a database available exclusively to law enforcement).

[42] *Id.* (quoting *U.S. v. Dolan*, 544 F.2d 1219, 1221–22 (4th Cir. 1976)).

[43] *Id.* (quoting *American Home Products Corp. v. Chelsea Laboratories, Inc.*, 572 F. Supp. 278, 281 (D.N.J. 1982)).

[44] *E.g., Howard v. Commonwealth*, 787 S.W.2d 264, 267 (Ky. App. 1989) ("In the case before us, appellant offered to sell the substance he had with him as marijuana. It is, therefore, evident he thought it was marijuana.").

*Jones* is that a jury can take even a layman's testimony in light of other evident circumstances to infer the identity of the substance without chemical testing.[45] It appears to us that the jury was able to do that here, where drug experts adequately identified the drugs and the jurors were aware of the surrounding circumstances of Young's operation. We conclude the trial court properly denied Young's motions for directed verdict.

### 2. *Group 1: Heroin and Methamphetamine.*

The Group 1 substances were in powder form and underwent partial sample testing in a lab to verify their identity. As to Group 1, Young argues that tests should have been run on the substances in each baggie to verify what they contained. KSP analyst and expert witness, Wendy Williams, only tested and chemically identified a measured sample from two of the baggies seized at Young's apartment, that is, one for heroin and one for methamphetamine, but she did not run tests on the substance contained in the other baggies.[46] Rather, Williams followed KSP policy and tested samples from the two baggies in an amount necessary for the statutory minimum, noted the similarity in appearance and texture between the substances she tested and the substances in the untested baggies, and she drew a conclusion that the untested baggies contained the same substance.

---

[45] And in holding, we joined most jurisdictions in this country. *Id.* at 254 ("Courts almost uniformly allow the introduction of circumstantial evidence in the absence of chemical testing to identify alleged controlled substances.").

[46] At trial, Williams testified that because of the volume of the drugs coming to the KSP Lab for testing that it was standard procedure to test only the amount statutorily necessary for a conviction. Otherwise, the backlog would be so severe that results would be prohibitively delayed.

Young argues that the jury could not have reasonably inferred the identity of the untested portions of the substance, especially considering Williams's admission on cross-examination that the baggies could have theoretically contained something else. Young argues an intent to distribute could not have been reasonably inferred either because no witness testified that he had offered to sell these substances. These arguments are unavailing.

First, while Young would require that these substances be proven with chemical certainty, that is not the standard of proof the Commonwealth had to meet. Jurors are only required to find the substances are what the Commonwealth purports them to be beyond a reasonable doubt,[47] not with unassailable certainty. Further, our standard of review for a motion for directed verdict requires us only to find there be enough evidence for a reasonable juror to make that finding. And our standard is no different regardless of whether that evidence is direct or circumstantial.[48]

Second, the reasonable-doubt standard leaves room for the jury to draw inferences as to certain material facts when direct evidence is unavailable. Inferences are by nature conclusions supplied by the rational faculties of the juror based on the juror's common sense, lived understanding of how the world is. While inferences inherently lack the certitude of direct observation, measurement, or empirical analysis, it is elementary that circumstantial evidence can support a criminal conviction.[49]

---

[47] *See Williams v. Commonwealth*, 721 S.W.2d 710, 712 (Ky. 1986).

[48] *Schrimsher v. Commonwealth*, 190 S.W.3d 318, 328 (Ky. 2006).

[49] *See id.*

In this case, the jury apparently applied these rational principles to the identity of the substances as well as to Young's intent to distribute. Young's logic would require that every grain of powder in every bag, even in the already-tested sample baggie, be tested to verify identity. Our law, like the law of practically every other jurisdiction, does not impose such a requirement. Williams's testimony that the remaining substances *could* be something else, such as rock salts or diluted counterfeits, was for the jury to weigh in its factual determinations. Even if Williams's testimony raised any doubt, the jury was not required to supplant its common-sense conclusions with hypothetical scenarios. The jury apparently listened to Williams's testimony, noted the amount of powdery substance tested for the statutory minimum for possession, noted the similarities in appearance and texture with the other baggies, and rationally inferred that the other baggies, all found similarly bagged in Young's possession, were the same as what was tested.[50]

The jury also properly inferred an intent to distribute even absent testimony that Young had offered to sell them. First, it is part of the record that Poole told the detective after the controlled buy that Young had offered to sell him a laundry list of other substances, including heroin. The element of intent to sell the drugs later found in Young's residence was supported by this testimony. Even without that testimony, the sheer variety and quantity of drugs on hand supports the jury's rational inference that Young intended to

---

[50] *Accord Jones*, at 254 ("The confirmation by chemical testing of two of the illicit drugs lends support to the likelihood that the other was authentic.").

distribute the drugs to others and that they were not merely for personal or recreational use.[51]

Therefore, the trial court properly denied a motion for directed verdict of acquittal as to Counts 2 and 3.

### 4.    *Group 2: Hydrocodone, Oxycodone, Adderall, and Suboxone.*

Group 2 includes Counts related to commercial controlled substances in pill or strip form.  The Commonwealth used expert pharmaceutical testimony to identify them.  Young's objections to this verification process are similar: the jury lacked certainty without chemical analysis and the expert witness himself admitted the pills *could* be something other than alleged.  At trial, pharmacist Darren Lacefield, with the assistance of an electronic phone application, identified the substances based on their appearance.  Like Group 1, the testifying expert admitted on cross-examination to the possibility that the identified substances could theoretically be convincing counterfeits.

This Court responds similarly to Group 2.  The Commonwealth called Lacefield, a trained pharmacist, to identify the substances in Group 2.  Part of his regular job is to be able to identify and sort these substances for prescribed public consumption.  He has the education and job experience to look at the trade dress of the pills, and conclude from their shape, color, and labeling what they are.  In arriving at the holding in *Jones*, we referred to a nearly identical identification process in a Texas case that held that a trained pharmacist's

---

[51] *See id.* at 253 (endorsing the reasoning of *Dolan*, 544 F.2d at 1221–22, that other circumstances of the defendant's position and arrest can soundly support an inference of a substance's illicit identity).

20

visual identification supported a rational inference as to the substance's identity.[52] We then stated "[s]ome deference should be given to the presumed integrity of this procedure of visual identification."[53]

Again, the possibility that a pharmacist's visual identification is mistaken is presumably accounted for by the jury, especially when the pharmacist humbly testified—as Lacefield did—to that possibility on cross-examination. The jury can and must be left to weigh that possibility of error, as with any witness's testimony. But it was not here unreasonable for the jury to take Lacefield's testimony into account to support its general inference, especially considering the circumstances surrounding Young's operation. The intent to distribute was also reasonably inferred as to all the drugs found in Young's possession for the reasons just stated for Group 1.

Therefore, with respect to Young's motions for directed verdict, we find no error in the trial court's declining to direct a verdict of acquittal because the jury was presented with sufficient evidence to convict Young of the counts charged.

### III.    CONCLUSION

We reverse the judgment because of the structural error created by the trial court's failure to conduct a *Faretta* hearing and to consider Young's request for hybrid representation. Otherwise, the Commonwealth committed

---

[52] *See is.* at 255 (citing *Sterling v. State of Texas*, 791 S.W.2d 274 (Tex. App. 1990) ("The court found that the evidence was sufficient to support the trial court's finding, stating: '[a] person who is familiar with a substance may identify it. An expert may identify a controlled substance without chemical analysis.'") (quotations kept consistent with citation to *Sterling*).

[53] Referring to the visual identification of alprazolam performed by lab technicians in *Jones.*

21

no *Brady* violations and the Commonwealth presented sufficient evidence to convict Young for the crimes charged. The case is remanded to the trial court for further proceedings consistent with this opinion.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Julia Karol Pearson
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Todd Dryden Ferguson
Assistant Attorney General